Sheila **BRINKLEY**, et al., Plaintiffs,

v.

Martha **HILL**, et al., Defendants.

No. CIV. A. 5:88–1502.

United States District Court,
S.D. West Virginia.

Oct. 15, 1997.

---

Daniel F. Hedges, Charleston, WV, for Plaintiffs.

Charlene A. Vaughan, Deputy Atty. Gen., Dept. of Health and Human Resources, for Defendants.

## MEMORANDUM OPINION AND ORDER

HALLANAN, Senior District Judge.

This matter is before the Court via Defendants' Motion to Dismiss and/or Vacate Previous Orders. Defendants have filed their motion to dismiss based upon Plaintiffs' failure to claim a violation of an enforceable right for which the Court can grant relief, in light of the recent Supreme Court ruling in *Blessing v. Freestone*, —— U.S. ——, 117 S.Ct. 1353, 137 L.Ed.2d 569 (1997). Additionally, Defendants assert that the Eleventh Amendment effectively bars Plaintiffs' request for relief in this matter. Having thoroughly reviewed Defendants' motion and supporting memoranda, as well as all documents supporting Plaintiffs' opposition to the motion, the voluminous record, and the relevant case law, the Court is now prepared to issue its ruling.

### BLESSING'S IMPACT ON THE LAW

Prior to *Blessing*, at the time when this Court initially became embroiled in this matter, the law was unsettled as to exactly what rights Title IV–D afforded custodial parents who sought the enforcement of various child support orders. A number of Courts found Title IV–D to grant a generalized right to compliance, or a general right to have each and every Title IV–D requirement fulfilled. Through *Blessing*, the Supreme Court has, for the first time, made it specifically apparent that no such rights exist. It is *Blessing's* landmark insight into the manner of interpretation of Title IV–D's rights and requirements that causes this Court to now revisit its own prior interpretation of what is or is not an individually enforceable right under Title IV–D.

---

1. It is not entirely clear whether Plaintiffs' second claim for relief is meant to represent only

### PROCEDURAL HISTORY

The original Complaint in this action was filed on November 15, 1988. The ensuing years have served witness to a great many procedural developments, several of which require a precise recounting.

1. *Plaintiffs' Amended Complaint*

Plaintiffs filed their First Amended Complaint (hereinafter Amended Complaint) on January 12, 1989. Plaintiffs' Amended Complaint includes six separate claims for relief. Plaintiffs' first claim for relief alleges that:

[D]efendants have violated 42 U.S.C. Section 654(b) and 45 CFR 302.33 by failing to timely pursue the enforcement of support orders for custodial parents who are not currently recipients of public assistance (hereinafter non-PA applicants) and by giving a lower priority to the support enforcement and collection on behalf of non-PA families than similar enforcement is given on behalf of families receiving aid to families with dependent children.

Amended Complaint at ¶ 25. In addition, Plaintiffs' first claim for relief alleges that "access to the services of the child advocate is inadequate for working non-PA persons seeking assistance from the child advocate." *Id.* However, there is no specific allegation that applicants receiving public assistance (hereinafter PA applicants) enjoy more favorable or convenient access.

Plaintiffs' second claim for relief centers around Defendants' alleged violation of 45 C.F.R. §§ 303.6, 303.10. Specifically, Plaintiffs claim that Defendants are guilty of:

"[F]ailing to identify delinquent support obligors of non-PA applicants within 30 days; ... failing to contact such individuals as soon as possible in order to enforce that obligation; ... failing to pursue the mandatory procedures to collect support on behalf of non-PA applicants[;] and ... failing to include applications for services received from non-PA applicants in its case assessment and prioritization system."

Plaintiffs' Amended Complaint at ¶ 26.[1]

Plaintiffs' third claim for relief relates to allegations that Defendants have violated

allegations of equal protection violations or additionally a blanket allegation that Defendants fail

"the standards and requirements of 45 C.F.R. 300 et seq. including but not limited to 45 C.F.R. 303.20 by failure to provide adequate staffing." *Id.* at ¶27.

Plaintiffs' fourth claim for relief is derived from allegations that "defendants have violated *W. Va. Code* 48A–2–3, 48A–3–3 and 48A–2–21." *Id.* at ¶28. Those violations relate to Defendants' failure to provide Plaintiffs with what they deem to be "comprehensive service" and to Defendants' failure to inform applicants that a then $25.00 fee could be waived.

Plaintiffs' fifth claim for relief alleges that "defendants have denied them equal protection in violation of the 4th Amendment to the U.S. Constitution by failing to provide services to non-PA applicants for support enforcement that are regularly provided to public assistance recipients." *Id.* at ¶ 29.

Plaintiffs' sixth claim for relief alleges Defendants to:

[H]ave otherwise violated 45 C.F.R. Sections 302 and 303 in the following ways including but not limited to:

(a) 45 C.F.R. 303.5(a)(2) by precluding establishment of paternity by acknowledgment[;]

(b) 45 C.F.R. 303.5, 303.1, and 303.20 by failing to take action regarding establishment of paternity and subsequent securing and enforcement of support orders following referral for services upon receipt of AFDC as required by 45 C.F.R. 303.31; and

(c) In other matters by not fully complying with the regulations.

*Id.* at ¶ 30. (Emphasis added).

Plaintiffs' Amended Complaint continues on to the prayer for relief which primarily requests that the Court enter a declaratory judgment pronouncing Defendants in violation of the various constitutional, statutory and regulatory requirements referenced in Plaintiffs' multiple claims for relief, and that the Court enter an injunction requiring Defendants to modify their standards of operation. Specifically, the Amended Complaint requests the Court to:

Enjoin the defendants from failing and refusing to:

(a) provide increased access for non-PA applicants by (i) extending office hours by one evening per week; (ii) accepting walk-in applicants;

(b) prominently post notice and inform all prospective clients that the $25.00 application fee is waivable;

(c) identify support obligors of all applicants within 30 days and to contact such individuals as soon as possible and otherwise take action;

(d) utilize the full range of enforcement mechanisms available on behalf of all applicants;

(e) insure adequate supervision and staffing to adequately support enforcement functions; [and]

(f) establish paternity by acknowledgment.

Amended Complaint at 15. In addition, Plaintiffs requested that the Court grant "[s]uch other and further relief as the Court may deem proper and just." *Id.*

Defendants filed their Answer to the Amended Complaint on February 1, 1989. Therein Defendants claimed that the suit was barred by the statute of limitations and laches. Additionally, Defendants asserted their Eleventh Amendment immunity, and claimed that Plaintiffs had failed to state a cause of action upon which relief could be granted.

### 2. *Defendants' Motion to Dismiss, or in the Alternative, for Summary Judgment and the Court's Response*

On October 11, 1989, Defendants filed a motion requesting the Court to dismiss the action, or in the alternative grant summary judgment in their favor. Defendants based their motion of October 11, 1989 on much the same grounds as is Defendants' current mo-

---

to live up to the standards set forth by 45 C.F.R. §§ 303.6, 303.10 in their dealings with both PA and non-PA applicants, however, it appears to be primarily an equal protection type argument. Paragraph twenty-six of Plaintiffs' Amended Complaint fails to specifically allege any disparate treatment of non-PA applicants; that is to say that Plaintiffs make no claims that PA applicants receive full compliance with 45 C.F.R §§ 303.6, 303.10.

tion to dismiss; namely that Plaintiffs had failed to claim a violation of an individually enforceable right, and that the suit was barred on Eleventh Amendment grounds. As of December 13, 1989, the time at which the Court initially rendered its decision with respect to whether Title IV–D of the Social Security Act created individually enforceable rights under 42 U.S.C. § 1983, there existed no consensus opinion on the matter. The Court, in looking to the language provided by *Hunt v. Robeson County Dept. Of Social Services,* 816 F.2d 150 (4th Cir.1987) and *Smith v. Kirk,* 821 F.2d 980 (4th Cir.1987), concluded that Title IV–D did indeed create such individually enforceable rights, and accordingly denied Defendants' motion. The Court reached that conclusion by focusing upon the mandatory language within the statute, such as that which declared that "a state plan . . . 'must provide' that the state has in effect a plan approved under IV–D, and operate a child support program in conformity therewith [and] . . . 'must provide' for the establishment of an organizational unit which meets the Secretary's staffing and organizational requirements . . ." Court Order of December 13, 1989 at 4. Evidently, the Court found that mandatory language in Title IV–D bestowed upon Plaintiffs a *generally* enforceable right to have Defendants comply with the various statutory and regulatory requirements enacted in support of Title IV–D's provisions. Much as the Ninth Circuit in *Blessing,* the Court did not break down the complaint to test for whether specific statutes created specific individually enforceable rights, the violation of which would result in a specific cause of action. *Some seven years later,* the Supreme Court has, for the first time, made it clear through its decision in *Blessing* that Title IV–D does not *generally* give rise to any individually enforceable rights. The Supreme Court therefore now offers the lower courts a more specific guideline for comprehensive interpretation of Title IV–D's duties and requirements. Specifically, *Blessing* held that "[o]nly when the complaint is broken down into manageable analytic bites can a court ascertain whether each separate claim satisfies the various criteria we have set forth for determining whether a federal statute creates rights." —— U.S. ——, ——, 117 S.Ct. 1353, 1360, 137 L.Ed.2d 569.

In addition to this Court's finding that Title IV–D generally created individually enforceable rights, this Court held that the Eleventh Amendment did not serve as a bar to Plaintiffs' action. The Court reasoned that, as Plaintiffs were seeking only injunctive relief, the action could not be considered as one against the state for Eleventh Amendment purposes.

### 3. *Plaintiffs' Amended Motion for Preliminary Injunction*

Plaintiffs' Amended Motion for Preliminary Injunction, filed on October 11, 1989, alleged roughly sixty-four constitutional, statutory, and regulatory violations and sought the Court to compel Defendants to modify their system of operation to conform with no fewer than seventy-six distinct mandates.[2]

---

**2.** Plaintiffs' prayer for injunctive relief was as follows:

[T]he plaintiffs respectfully move that this Court enter a preliminary and permanent order mandatorily enjoining the defendant from:

1. (*Procedures for Establishment and Enforcement of Support* ) Failing or refusing to pursue all appropriate procedures for establishment and enforcement of support including, but not limited to:

(a) Using a comprehensive intake form, including the taking of information on all real and personal property and bank accounts owned by the delinquent obligor or owned by an obligor at any time within which support might have been due and was transferred to attempt to avoid payment of support.

(b) Inquiring about and recording the nature and location of all real and personal property upon intake and all other appropriate stages.

(c) Evaluating all requests for enforcement, by first considering and pursuing as appropriate the withholding of wages, worker's compensation, unemployment compensation, and tax offset; and further, if wage withholding is not available, sufficient, or will not quickly pay all accrued support, then by obtaining consensual liens or other security, filing affidavits of accrued support, and pursuing as appropriate: (i) executions on personal property, (ii) suggestions, (iii) interrogatories to obligors, (iv) fraudulent transfer proceedings, (v) attachments, (vi) foreclosures, (vii) judicial sale proceedings, (viii) contempt proceedings, and/or (ix) other proceedings in enforcement.

(d) Instituting suits on all cases in which support has been previously established and there is at least $500 of accrued support due to obtain decretal judgments within fifteen days of application for service.

(e) Filing real estate liens for each decretal judgment obtained in all counties in which an obligor has or may in the future have property, and enforcing said liens through appropriate judicial procedures.

(f) With respect to the identification of delinquent obligors, instituting and maintaining up to date an effective computerized "tickler system" to identify all delinquent obligors, including follow up on a routinized basis (i.e., if thirty days in arrears do an automatic wage withholding based upon computer generated information[ ] ].

(g) Including statutory prejudgment interest in the computation of all amounts due to obligees and in all proceedings seeking judgments on behalf of obligees; and implementing procedures to assure the inclusion of statutory post-judgment interest in all calculation procedures on behalf of obligees.

(h) Periodically reviewing the caseload no less frequently than once every year for purposes of new tax intercepts.

(i) Setting up and following a procedure for obtaining annual financial statements from obligors.

(j) Obtaining the earnings information available from the computer and immediately processing it.

(k) Implementing an effective postal and employer locate procedure (and other appropriate services) at the local level (with an interagency system to prevent duplicate locates at state level).

(l) Implementing an effective procedure for use of the federal locate service by the local office with written criteria for its use.

(m) Implementing a system for interagency searches, interstate searches, credit agency searches, and federal searches on a reasonable time frame.

(n) In cases where there has not been a support order established as the result of a domestic proceeding, developing and using a formula for determining accrued amounts owed the state which takes into consideration the needs of other children of absent parents and all other relevant factors set forth in 45 C.F.R. § 302.53; and implementing procedures to assure an in-house determination of amount due the state based on ability to pay for the relevant time periods of receipt of assistance after obtaining available information from employers, absent parents, and other potential sources, and after due consultation with such absent parent prior to any specific statement of support alleged to be due; and following judgment (or by agreement with the absent parent) complying with the state statutory limitations on wage suggestion.

(o) In appropriate cases, instituting proceedings under the state long-arm statutes to obtain establishment or enforcement of support, or instituting proceedings in federal court to obtain establishment or enforcement of support in a domestic proceeding.

(p) Taking action against employers who do not respond, who do not correctly honor wage withholding notices, or who otherwise do not cooperate with collection procedures.

(q) Requesting full collection services from the Secretary of the Treasury in appropriate cases.

(r) Assuring that Child Advocates provide proper representation by (i) gathering all relevant information and date from the obligee prior to court presentation; (ii) participating in a proceeding in which the obligee and obligor are parties only if such Child Advocate presents and seeks thoroughly and adequately the entire entitlement of the obligee; (iii) participating in a proceeding in which the obligee and obligor are parties, only after thorough preparation by timely and adequate interviews of potential witnesses, adequate and timely notice to the obligee of any hearing; at such hearing presentation of the obligee's position and evidence and appropriate cross-examination of the obligor's witnesses; and following such hearing effective presentation of objections and effective appeal from adverse determinations; (iv) assuring that the obligee receives support due prior to reimbursement for AFDC benefits paid except in the case of tax intercepts; (v) assuring that paralegals do not give legal advice and work only under the supervision of the Child Advocate; and (vi) assuring that information obtained by the CAO is not turned over to other functions in the agency which might be used against clients.

(s) Implementing a procedure with unemployment compensation to assure transmission of data therefrom within twenty days of payment made.

2. (*Timely Actions*) Failing or refusing to take action in a timely manner by failing to:

(a) Open a case within two working days of request for services.

(b) Solicit necessary information within fifteen days of application; within fifteen days of any request for information, followup (sic) with appropriate action if not received.

(c) Determine what locate actions are necessary within three working days of request for services.

(d) Initiate appropriate services within two working days of locate.

(e) Distribute all support collections to obligees within ten days of receipt.

(f) Proceed with paternity determination proceedings and order without waiting for payment of birth costs.

3. (*Efforts for Non–PA Clients*) Failing or refusing to pursue the same efforts on behalf of custodial parents who are not recipients of public assistance (hereinafter "non-PA clients") as on behalf of custodial parents who are recipients of public assistance (hereinafter "PA clients") in obtaining child support due, including but not limited to the following efforts:

(a) Informing unsuccessful applicants for public assistance and terminated recipients (including medicaid only) that they have the right to apply for and obtain CAO services, and do so in writing or by mail; and making available written notices of right to apply and assisting in processing applications for CAO services to such assistance applicants at the time of the IV–D interview.

(b) Informing non-PA clients seeking CAO service that the child Advocate Office can initiate proceedings to establish support, and assisting in the application process therefore; and further, initiating all such proceedings and procedures on a timely basis.

(c) Pursuing tax intercepts on behalf of non-PA clients on a timely basis without supplemental requests (i.e., automatic for non-PA clients as for PA clients).

(d) Automatically reviewing periodically non-PA clients on the same basis as PA clients.

(e) Initiating suits for establishment of support and for decretal judgments for amounts due on behalf of non-PA clients on the same basis as PA clients.

4. (*Adequate Staffing*) Failing or refusing to provide staffing as follows:

(a) An organizational system in which the Child Advocate directly supervises the work of the paralegals and other personnel in the office.

(b) An intake investigator shall do all initial intake and prepare for review by the supervisor who shall assign each case to a paralegal with priority actions noted.

(c) Audit clerk(s) who is responsible for (i) screening all phone calls and referring those calls dealing with policy questions to the Child Advocate or supervisor and calls dealing with case information to the investigator, (ii) posting all monthly payments to the case record, (iii) reviewing all computer data and providing appropriate information to paralegals, and (iv) preparing a list of all cases (PA and non-PA) for tax intercept.

(d) URESA paralegal(s) (as needed depending on caseload) to handle all incoming and outgoing URESA cases.

(e) Paralegals (as needed depending on caseload) trained to handle all establishment and enforcement actions except URESA under the direction and supervision of the Child Advocate.

(f) A paralegal supervisor who shall review all incoming cases and monitor work flow by random case reading and reviewing all cases at one-year intervals under the direction and supervision of the Child Advocate.

(g) All staff vacancies in CAO shall be filled within thirty days.

5. (*Organizational Structure*) Failing or refusing to insure timely and adequate services by:

(a) Having the supervisor assign all new cases after ass for action.

(b) Having all cases worked on each day given to a supervisor to review, approve, and log each

action and recommend further action as necessary.

(c) Having each case returned to the paralegals by the supervisor after review for further action.

(d) Having workers review Fifteen old cases each week.

(e) Having a "tickler system" to insure that all required actions are undertaken in a timely manner.

(f) Implementing a new computer system as follows: (i) one which can retrieve case data by obligee name, obligor name, or child name; (ii)one which shall track thirty-day delinquent payors and forward this information and data to the local office; (iii)one which shall track those payors who pay due to court action (rather than that of the IV–D agency); (iv) one which shall identify wages paid to Social Security numbers in any location and a printout thereof shall be provided to workers; and (v) one which can timely access unemployment benefits. A child support computer project manager shall be hired within thirty days to redesign the computer system as necessary, which installation shall be completed within one year of the entry of the Order. Those actions necessary to secure the 90% match for an automated IV–D system shall be initiated within thirty days and pursued with diligence until completed.

(g) Assuring that all records shall be maintained in ascending date order, with the oldest data in the back organized as follows: first, intake forms; second, correspondence; third, legal actions; fourth, data cards; fifth, arrearage and financial data.

6. (*Monitoring*) Failing or refusing to:

(a) Monitor each Child Advocate Office at least once every three months by a State Monitor who shall pull not less than thirty-five cases at random and make an assessment; and as to the cases to be reviewed, time frames shall be established for all actions of workers and advocates.

(b) Train workers on state and federal regulations, court procedures, policy, record maintenance, time management, confidentiality, information to be noted in files, appropriate/inappropriate questioning during the interview process, which training shall be at least annually, after initial training.

(c) Evaluate workers for job performance based on written criteria (point system of actions taken) at six-month intervals by review of workers' caseload; those workers not meeting the standards shall be required to obtain additional training, and it (sic) further evaluations result in negative evaluations, they shall be terminated.

7. (*Confidentiality*) Failing or refusing to assure that only authorized persons have access to the individual client files; failing to instruct workers regarding the kind of information that can be provided to the absent parent or to other persons; failing to assure that information obtained through client interview is not shared with other parts of the agency and used against the client.

The vast majority of Plaintiffs' allegations regarding Defendants' violations are found in Plaintiffs' Amended Motion for Preliminary Injunction, and not in the Complaint or Amended Complaint. Likewise, the relief sought by Plaintiffs in their Amended Motion for Preliminary Injunction is vastly different than that sought, and detailed above, in the Amended Complaint. In their Amended Motion for Preliminary Injunction Plaintiffs request the Court to delve into the essence of the day-to-day operations of the Child Advocate Office (hereinafter CAO). The following are illustrative of the Court ordered relief sought by Plaintiffs:

(1) Require Defendants to "[f]ile[ ] real estate liens for each decretal judgment obtained in all counties in which an obligor has or may in the future have property, and enforce[ ] said liens through appropriate judicial procedures." Plaintiffs' Amended Motion for Preliminary Injunction at 8.

(2) Require Defendants to "instituted[ ] and maintain[ ] up to date an effective computerized 'tickler system'. . ." Id.

(3) Require that Defendants "[i]mplement[ ] an effective postal and employer locate procedure (and other appropriate services) at the local level (with inter-agency system to prevent duplicate locates at state level)." Id. at 9.

(4) Require Defendants to "assure[ ] that information obtained by the CAO is not turned over to other functions in the agency which might be used against clients." Id. at 11.

(5) Require Defendants to hire an intake investigator who "shall do all initial intake and prepare for review by the supervisor who shall assign each case to a paralegal with priority actions noted." Id. at 13.

(6) Require Defendants to assure that their workers "review fifteen old cases each week." Id. at 14.

(7) Require that Defendants "[e]valuate workers for job performance based on written criteria (point system of actions taken) at six month intervals . . . those workers not meeting the standards shall be required to obtain additional training, and if further evaluations result in negative evaluations, they shall be terminated." Id. at 15.

Additionally, the Court notes that Plaintiffs' Amended Motion for Preliminary Injunction makes numerous requests for the Court to insure that Defendants perform their duties in an "effective", "thorough", or "adequate" manner.

4. *The Court's Order of February 28, 1990 and Revisions Thereof Made by Way of Order on October 29, 1990*

On February 28, 1990, the Court issued its ruling on Plaintiffs' Amended Motion for Preliminary Injunction. The Order resulted in the Court enjoining Defendants from failing to perform a multitude of functions including monitoring each CAO every three months, evaluating CAO employees every six months, obtaining from obligees at intake information which includes all real and personal property, being prepared for and performing professionally during various hearings, and further enjoining Defendants from failing to employ sufficient staff to implement the required actions and procedures.

One portion of the Court's February 28 Order pertained to requirements that the Court imposed upon Defendants regarding the organizational structure of the CAO. By Order of October 29, 1990, the Court determined that Defendants were in substantial non-compliance regarding those provisions, found the Defendants to be in contempt of

---

8. (*Miscellaneous* ) Failing or refusing to:
(a) Implement a procedure for AFDC eligibility that takes into consideration occasional but irregular payments of child support and does not close a case (but suspends it as active but without actual payment as appropriate) until a regular pattern of support is established.
(b) Implement a procedure to assure monthly (post-AFDC only in any month in which a sup-

port payment is made) notice to AFDC and post-AFDC recipients of support collections, including therein the amount collected, current support obligation, total amount of arrearage owed, distribution to the state and client, and an explanation of how all distributions were calculated; and further, provide an opportunity for a hearing to contest an issue of payment or pass through.

the February 28 Order, and further clarified

Defendants' duties under the order of injunction.[3] While the requirements imposed upon

**3.** In full, the Courts Revised Order of October 29, 1990 enjoined Defendants from:

a. Failing to provide an organizational system in which Child Advocates directly supervise and assume responsibility for *all* work and *all* personnel of the regional offices of the West Virginia Child Advocate Office. Child Advocates are solely authorized to (1) determine matters that are legal versus administrative, (2) delegate administrative and legal duties and responsibilities among office staff, and (3) supervise all regional CAO employees irrespective of their title. In this connection, the division of legal and administrative units shall end forthwith. In those matters which the Child Advocate determines are non-legal and administrative in nature, the Child Advocate may assign responsibility therefor to those persons now identified as Child Advocate Office Supervisors. The term Child Advocate Office Supervisor should be changed to Office Administrative Assistant to more clearly reflect their subordinate position to the Child Advocate. The Office Administrative Assistant shall not interfere with the duties and responsibilities of the Child Advocate insofar as they relate to (1) determining matters that are legal versus administrative, (2) delegating administrative and legal duties and responsibilities among office staff, (3) supervising all regional CAO employees, particularly Child Support Enforcement Specialists and Legal Assistants, and (4) providing necessary on-site training to regional CAO staff on an ad hoc basis without approval by the Director of the West Virginia Child Advocate Office.

b. failing to train Child Support Specialists, Legal Assistants and other essential personnel on state and federal regulations, court procedures, CAO policy, record maintenance, time management, confidentiality, information to be noted in files, and appropriate questions during the initial interview process. Such training shall take place on an annual basis once an individual has received initial training under the supervision of the child advocate....

c. failing to establish a procedure whereby the Child Advocate directly supervises the client intake process and receives client information upon intake. Having received client information from Child support Enforcement Specialists and made an initial determination as to proper legal procedures and remedies to pursue, the Child Advocate may then present the client information to the Office administrative Assistant for logging and filing. Thereafter, the Child Advocate may call upon the client file for further review. Such a procedure ensures that the Child Advocate commands the flow of client information within his/her regional CAO.

d. failing to provide a legal unit at the State level capable by way of sufficient and professional staff to (1) provide leadership, (2) coordinate regional CAO activities, (3) monitor each CAO every three months by random inspection of cases for action taken therein, (4) establish a

time frame within which certain actions must be taken when no actions have been taken therein, (5) determine the desirability of judicial appeals by Child Advocate after seeking input from the Child Advocate on the case, and (6) ensure compliance with the provisions of this Order.

e. failing to evaluate CAO employees for job performance at six month intervals and acting accordingly upon results of evaluations. Again, the West Virginia Child Advocate Office does not operate in order to avoid grievance filings by employees.

f. failing to obtain from the obligee upon intake and at other appropriate stages, and from such other appropriate sources, information regarding all real and personal property of the obligor and bank accounts of the obligor, notwithstanding the additions to the PLS–1 Initial Referral Form to elicit from the obligee information about real and personal assets of the obligor for both public assistance and non-public assistance cases.

g. failing to utilize Department of Treasury collection services as provided at 42 U.S.C. § 652(b).

h. failing to service clients in a timely and expeditious manner under a clearly established time frame such that undue delay does not violate obligees' rights to timely and much-needed services.

i. failing to *utilize fundamental legal remedies* in servicing clients such as wage withholding, workers compensation intercept, tax offset, liens, contempt proceedings, attachments, foreclosures, computing statutory interest on arrears, use of the West Virginia longarm statute to assert jurisdiction over an obligor, pursuing actions against employers who do not comply with wage withholding and instituting a tickler system; failing to provide written instructions to Child Advocates as to the aforementioned legal remedies.

j. failing to compute and submit statutory interest in arrears, owed by obligors to obligees, for evaluation and ruling at hearings before a Family Law Master or the West Virginia Circuit Court.

k. failing as a Child Advocate to prepare for, and perform during, various hearings in a professional manner.

*l.* failing to pursue the same efforts on behalf of custodial parents who are not recipients of public assistance as those pursued on behalf of custodial parents who are recipients of public assistance. Such efforts would include but not be limited to, the following:

i) Automatically pursuing tax intercepts on behalf of non-public assistance clients.

ii) periodically reviewing non-public assistance cases.

iii) pursuing enforcement remedies, including appropriate notice in bankruptcy cases of a child support obligation, on behalf of the

Defendants with regard to providing the proper organizational structure were intensified, including the addition of directives pertaining to the use of proper personnel titles, and the order in which each diversely titled member should or should not intervene in a particular case, all other decrees remained substantially the same.

### 5. The Court's Final Order of December 5, 1990

On December 5, 1990, the Court issued its 'Final Order' which reflected the culmination of various agreements reached between ·the parties. It was noted that the parties entered into those agreements so as to reach a resolution of all matters, and to proceed with making what had been viewed as the necessary alterations required to produce an effective system of child support collection. While Defendants willfully entered into those agreements, they admitted none of the allegations. The initial portion of the Final Order amounted to no more than a recitation of the injunctive relief granted in the Court's revised Order of October 29, 1990. The additional language of the Order required the creation of an implementation advisory committee, the purpose of which was to make recommendations for the implementation of the initial portion of the Order.[4] Additionally, the Court Ordered that the committee retain counsel on a part time basis, and that counsel was to be selected by joint agreement of the parties. The committee was to be in effect for two years with meetings held the first Wednesday of every month.

While the Court's Order of December 5, 1990 was entered as the "Final Order" in the matter, it was far from the last order entered by the Court, as the Court received from the parties no fewer than a dozen additional "agreed Orders" over the course of the following years.

### 6. Court Order of August 12, 1991

By Order entered August 12, 1991, the Court restated various Orders made from the bench on August 8, 1991. Those Orders consisted of (1) requiring Defendants to print a revised Child Advocate Manual and make it. available to every Child Advocate attorney within the following five weeks, (2) requiring the Secretary of the West Virginia Department of Health and Human Resources to appoint a full time director of the CAO within the following thirty days, and (3) requiring

non-public assistance clients on the same basis as for public assistance clients.

iv) initiating suits for decretal judgments for amounts due on behalf of non-public assistance clients and amending the CAO policy in this regard.

m. failing to provide quarterly notices to AFDC and post-AFDC recipients of support collections. Such notices shall include (1) amounts collected, (2) distributions to the State, (3) distributions to the client, (4) current support obligations, and (5) amount of arrearages owed. Such quarterly notice shall continue until January 1, 1993, when the State pursuant to federal regulation must provide monthly notice unless a waiver has been obtained. Should the State obtain a waiver through September 30, 1995, as permitted under the federal regulatory scheme, quarterly notice shall continue until the State's compliance with the federally mandated monthly notice.

n. failing to coordinate with the IV–A agency a procedure whereby unsuccessful applicants for public assistance, as well terminated recipients, are informed as a matter of course of their right to CAO services.

o. failing to coordinate with the IV–A agency a procedure whereby occasional but irregular child support payments do not result in the termination of AFDC benefits and a subsequent reapplication when further support payments are not forthcoming until a regular pattern of support is established.

p. failing to employ sufficient numbers of staff personnel to implement all of the above actions and/or procedures.

q. failing to implement all of the above actions and procedures forthwith through revising the CAO manual and other existing policies, education and posting of this Order in each of· the regional Child Advocate Offices as well as the 55 county economic services offices.
Court's Revised Order of October 29, 1990 at 12–16.

4. The committee was ordered to be comprised of eleven persons made up of, three members of Plaintiffs' counsel or their designees, one obligee selected by agreement, the Director of the Child Advocate Office, the General Counsel of the Child Advocate Office, a Supreme Court Administrator or Director of Family Law Master System, one Child Advocate, one Family law Master, the Secretary of the Department of Health and Human Resources or Administrative Assistant, and the Administrator of the Division of Human Services or designee. Court's Final Order at 9.

the Secretary of the West Virginia Department of Health and Human Resources to appoint full time general counsel within the following thirty days.

### 7. Court Order of August 19, 1991

In response to Plaintiffs' motion to do so, the Court, by Order entered August 19, 1991, modified the "Final Order." The modified Order served to appoint Betty Justice as Implementation Coordinator, and to define the duties of that office. Those duties involved: (1) investigating matters related to the implementation of the Court's "Final Order"; (2) having access to all records for purposes of gathering information to measure levels of compliance; (3) issuing recommendations for the resolution of issues between the parties; (4) establishing a

### 8. Court Order of June 15, 1992

On January 22, 1992, Plaintiffs sought the resolution of various matters through the Implementation Advisory Committee and the Implementation Coordinator. In response to the Implementation Coordinator's recommendations, the Court, on June 15, 1992, entered an agreed Order establishing twenty-six distinct mandates which delved deeply into the specific daily operations of the CAO, such as requiring a specific number of phone lines, specific organization and labeling of paperwork, and the performance of specific duties of CAO personnel.[5]

reporting system to measure levels of compliance; (5) scheduling meetings of the Implementation Advisory Committee; and (6) reporting levels of compliance to the Court.

5. The full body of requirements mandated by the Court's Order of June 15, 1997 is as follows:

1. Effective July 1, 1992, the CAO shall cease the use of group contacts for intake and case handling activities and policy shall be amended in this regard.

2. Effective August 1, 1992, all CAO contacts with obligees or obligors shall take place in a physical space with four walls that reach to the ceiling and have a door. The walls shall be sufficiently insulated to assure the privacy of normal conversation within the room. The only exception shall be contacts that occur in locations selected by the obligor or obligee and agreed to by the CAO as an accommodation of that individual.

The CAO and DHHR may accomplish this by using rooms now used as offices, by using other public buildings, etc. This time frame does not anticipate an immediate move to different facilities but the CAO and DHHR may choose to achieve long term compliance with this requirement by such moves.

3. By January 1, 1993, the CAO and DHHR shall assure that there is a local telephone line and a separate long distance line for every ten employees regularly assigned to an office, whether as temporary or permanent employees.

By January 1, 1994, the CAO and DHHR shall assure that there is a local telephone line for every five regularly assigned employees in an office, whether temporary or permanent employees.

No line dedicated to a particular purpose such as fax or computer transmissions or trunk lines to state or sub-area offices can be included in the required number.

By January 1, 1993, the CAO and DHHR shall provide each permanent CAO employee within the regional CAO offices with a telephone instrument for the employee's individual use and shall equip each interview room regularly used by the CAO with a telephone instrument.

4. Effective July 1, 1992, the regional CAO offices shall accept telephone calls during all regularly scheduled business hours. It is acceptable that staff, including attorneys, have scheduled protected time during which they may concentrate on projects best done without interruptions. Such scheduling is at the discretion of the local office but shall at all times assure coverage of the office by a legal assistant who will address emergency calls received by all staff and will provide personal contact to all persons who come into the office in connection with a case.

5. Effective January 1, 1993, the CAO and the DHHR shall equip each interview room regularly used by the CAO with a computer that has access to all data bases maintained or used by the CAO.

6. Effective July 1, 1992, the CAO shall not require face-to-face interviews or the completion of new PLS–1 forms of persons referred from the Income Maintenance Agency due to the reopening of public assistance benefits if such an interview has taken place within the preceding two years or a PLS–1 has been completed during that period unless action on the case cannot proceed otherwise. The CAO shall amend its policy in this regard.

7. Effective July 1, 1992, the CAO shall assist any person who walks into an office without an appointment in completing an application and information form and conduct any needed interview at that time unless the person chooses to return at another time for an interview. Absent highly unusual circumstances, no individual shall wait more than an hour for such assistance to begin. CAO policy shall be amended in this regard.

8. Effective July 1, 1992, the CAO shall eliminate the $1.00 application fee for NPA services.

9. Effective July 1, 1992, the CAO shall specifically advise NPA applicants for wage-withholding-only services of the benefits of other enforcement mechanisms 'for collecting either arrearages or current support that exceeds the amount permitted by law to be withheld from wages. CAO policy shall be so amended.

10. Effective July 1, 1992, the CAO shall use a simplified application for wage-withholding-only services only that request only the information necessary for the provisions of that service. That application process shall not require a personal interview, but an interview shall be available as an option to the applicant. Policy shall be amended in this regard.

11. Effective July 1, 1992, the CAO shall in addition to any wage withholding, utilize other appropriate enforcement methods in all cases with arrears that cannot be collected in full at the standard level of wage withholding within one year. Policy shall be amended in this regard.

12. Effective July 1, 1992, the CAO shall handle cases seeking wage withholding only services where the employer is known and the support Order is presented by mailing appropriate documents to said employer within two days of an application for that service. This process shall not be delayed because of the lack of information unrelated to the institution of a wage withholding or on the basis that the case has not been officially opened in the data system. Policy shall be amended in this regard.

13. Effective July 1, 1992, the DHHR and the CAO shall assure that all documents relating to CAO activity are mailed directly to the CAO regional office. The CAO may decide whether mail is to be distributed to regional offices directly at the state level or through regional offices.

14. Effective July 1, 1992, the CAO may permit the execution of documents per the choice of the individual either in coming to the CAO Office or in receiving documents by mail and returning by mail or in person when executed. Receipt by the CAO shall be acknowledged on the document and a copy provided to the person. Policy shall be amended in this regard.

15. Effective September 1, 1992, the CAO and DHHR shall assure a staffing level of one legal assistant for every 550 cases in a regional office. Because caseloads are ever changing, this figure can have a variance of 25 cases but at no time shall a legal assistant be responsible for more than 575 cases. Adjustments of case loads and appropriate assignment of staff shall take place at six month intervals after September 1, 1992 to achieve the prescribed staffing level.

16. By January 1, 1993, the CAO shall provide training of no less than 6 hours to all staff in the role and values that underlie the public policy the CAO has been assigned to enforce. This training should include training in legal ethics. By the same date, the CAO shall provide all legal assistants with no less than 18 hours training that includes introduction to the legal system, civil procedure and substantive law relating to child support establishment and enforcement.

17. Effective July 1, 1992, the CAO shall organize all new case files per a standard protocol and shall organize all existing cases per that protocol by June 30, 1993. The CAO may impose an earlier deadline for the completion of this task. Each record shall include a face sheet that indicates the current status of a case and the date of the opening and closing of each mandated action on a case.

18. By July 1, 1992, the CAO shall develop and require the use of standard registers for tracking action on cases, the use of various remedies, and the entry of orders.

19. By July 1, 1992, the CAO shall submit a detailed explanation of the duties and uses of the legal unit required in Paragraph 4 of the Court's Order of December 5, 1990 in meeting the overall requirements imposed on the CAO by said Order and further requirements imposed on the CAO in this Order.

20. Effective July 1, 1992, the CAO shall have in place performance standards for staff productivity. The standard[s] shall be no less strict than a requirement that beginning September 1, 1992, each regional office shall each month complete action on a number of cases in each activity area that is no less than the average number of cases opened in that region during the months January through June, 1992, requiring such activity. For example, if an average of 15 cases have been opened needing paternity established, the paternity should be established in at least 15 of the cases in that office's paternity caseload.

21. Effective beginning September 1, 1992, each CAO regional office shall each month complete needed action on 10 cases in paternity establishment, support establishment for persons not needing paternity establishment, and enforcement. Region 9 shall complete action in 20 cases in each category. This requirement is in addition to that imposed in Paragraph 14. This standard is interim in nature as it would permit many CAO regions more than five years to reduce the current backlog of cases, a time frame clearly unacceptable under federal time frames, *Brinkley*, or legislative oversight.

22. To help reduce the enormous backlog in cases needing paternity establishment, the CAO shall develop and institute by July 1, 1992 a plan for establishing paternity and support orders by March 31, 1993 in at least 1,000 of the more than 12,000 cases shown in the March 31, 1992 federal OSCE–156 report as awaiting paternity establishment. This number is over and above that included in the goals for the CAO regional offices in Paragraphs 20 and 21. The CAO shall provide a list of cases by name and by region to be addressed in this project to the *Brinkley* Implementation Coordinator by July 1, 1992. This goal may be accomplished by the use of CAO floating attorneys, assistant general counsels, contract attorneys, pro bono projects, the WVU Law School Clinic and other methods it may identify. A monthly report shall be provided detailing the numbers of cases by region at par-

To further illustrate, the Court required that:

1. all CAO contacts with obligees or obligors take place in a 'physical space' with four walls that reach to the ceiling and have a door;

2. the CAO assure the existence of one local telephone line and a separate long distance line for every ten employees, and within a year to require the same for every five employees;

3. the CAO assure staffing of one legal assistant for every 550 cases in a regional office;

4. the CAO provide no less than six hours of training to all staff relating to "the role and values that underlie the public policy the CAO has been assigned to enforce;" and

5. each CAO regional office complete all needed action on ten paternity establishment cases each month, with Region 9 completing twenty of said cases. Court Order of June 15, 1992 at 1, 2, 5, 7.

### 9. *Court Order of January 20, 1993*

On August 21, 1992, Plaintiffs again sought resolution of various matters, this time regarding the recoupment of overpayments from obligees. Pursuant to recommendations of the Implementation Coordinator, the Court again entered an agreed Order granting Plaintiffs relief. The Court's Order of January 20, 1993 contained sixteen separate mandates relating to various policies concerning overpayment. The requirements of the Court's Order included the following:

2. The Child Advocate Office shall establish a centralized repayment management system that shall be responsible for initiating and managing all repayments from obligees ... The accounting for this system shall be independent of the accounting in the child support case...;

9. A repayment agreement must be reasonably related to the recipients income and resources. There shall be a $10 minimum monthly payment unless the obligee comes forward and provides evidence of an inability to pay ...; and

12. In cases other than the failure of a PA recipient to redirect child support, the monthly amount to be paid under a CAO repayment agreement shall be negotiable, but otherwise shall be calculated at one percent (1 %) of the total debt (amount of repayment). This amount shall be limited to not more than ten percent (10%) of the obligee's monthly income unless the obligee chooses to pay a larger amount.

Court Order of January 20, 1993 at 2, 5–6. Once again the Court, through the agreed Order, clearly became party to the instructing and managing of the CAO's specific duties.

### 10. *Court Order of January 6, 1994*

Again, by way of Plaintiffs' request for resolution and the Implementation Coordina-

ticular stages of paternity establishment, e.g. complaint filed, civil action number, blood testing scheduled, etc. The CAO shall have a similar effort for at least 1,000 cases needing paternity establishment during 1993 and 1994.

23. The CAO shall provide enforcement services sufficient to assure that, by January 1, 1993, each regional office secures enforcement and collects some payment during that month on at least 60% of all orders in effect on that date.

24. Effective April 15, 1992, the CAO shall pilot a modified intake procedure that includes initial establishment and enforcement activities such as location efforts, drafting and verification of complaints, affidavits and other documents and the initiation of appropriate enforcement activities. These activities shall take place simultaneously with an interview, if an interview takes place and with the initial substantive actions of any case not requiring an interview. This proce-

dure shall permit completion of the application process by mail or telephone as practical. These activities shall begin without regard to whether a case has been entered into the data system. Policy shall be so amended.... This procedure is to be reviewed monthly and modified based on the experience gained through its use and shall be implemented statewide July 1, 1992.

25. Effective July 1, 1992, the CAO shall permit regional offices to have the option to do the same intake for persons applying for public assistance and its policies shall be amended in this regard.

26. The CAO shall by July 1, 1992 provide a plan to the *Brinkley* Implementation Coordinator for computer generating a complete list of cases by October 1, 1992 by region that are in its system prior to 1990 and on which there have not been any collections of child support by June 1, 1992.

tor's recommendation, the Court issued an agreed Order which granted relief to Plaintiffs by further directing the policy of the CAO. The Court's Order of January 6, 1994 contained nineteen distinct mandates relating to the manner in which the CAO should distribute child support to the obligees. The Order related to all matters of support distribution including the amount to be sent out, the proper interest to be applied to delinquent payments, the time frame in which disbursements were to be made (time frames which varied according to the specific scenario at hand), and the proper bookkeeping procedures to insure efficient distribution.

### 11. *Court Order of April 15, 1994*

On March 11, 1994, Plaintiffs filed a motion which sought the Court's entering of an Order requiring compliance with the Court's previous Order of June 15, 1992. It appeared that Defendants were not meeting the Court's mandate of employing one (1) Legal Assistant per every 550 cases. The Court found that a total of 220 Legal Assistants would be required for the CAO to be in compliance. The Court therefore Ordered that the "Department of Health and Human Resources ... make a determination as to whether employee positions can be transferred from other programs ... to the Child Advocate Office ... To the extent that any such position can be transferred ... such transfer shall take place by August 1, 1994." Court Order of April 15, 1994 at 1. Additionally, as the CAO's budget was found to have been insufficient to create new positions, the Court ordered Defendants to seek additional funding from the West Virginia Legislature to create any new positions that may remain necessary after all possible transfers had been completed. *Id.* at 2.

By no means is the discussion above inclusive of all Orders which this Court has issued

with respect to this matter. There have been numerous others, both modest and sweeping, including several which related to the CAO's proper implementation of the computer system OSCAR. See Court Orders of December 6, 1995; December 19, 1995; January 4, 1996; March 15, 1995; and June 6, 1996. Together, the case file in this matter contains close to four-hundred documents, the bulk of which represent Plaintiffs' call for the Court to embroil itself in the day to day operations of the CAO, and Defendants' acquiescence, by stipulation or otherwise, to the same.

The Court hopes that the in-depth reflection it has given the sampling of Orders listed above has fully illustrated the extent to which the Court has been pulled into the position of micro-managing the CAO. Such micro-management was not the Court's intention, and further the Court is of the opinion, as apparently are Justices O'Connor and Souter,[6] that micro-management is not the proper role of a Federal court.

The Court entered this matter with hopes of rectifying the most egregious violations, those which caused the Subcommittee on Public Assistance and Unemployment Compensation, of the House Committee on Ways and Means, to award West Virginia a grade of 'F' with regard to its undertaking of child support enforcement[7] And while the Court makes no apologies for its actions over the past nine years, and in fact feels as though its endeavors have required the CAO to achieve higher standards, the Court nonetheless recognizes that it ultimately became part of a process that involved micro-management of the CAO. The ensuing micro-management should truthfully come as no surprise. After all, what alternate path is left a court which begins from a premise that holds custodial parents have a generalized right to have the state agency efficiently

---

Court Order of June 15, 1992 at 1–9.

**6.** During oral argument in *Blessing*, justice O'Connor declared that "the notion that the Federal court could be asked to come in and just take over the whole idea of whether there is substantial compliance in all its details, supervise it, struck me as going beyond any case that this [Court] had ever handed down." Transcript of Oral Argument, *Blessing v. Freestone*, 1997 WL

8589 at 29 (1997). Similarly, Justice Souter questioned "why should a court in effect take over an obligation which has pretty clearly been delineated to be that of the Secretary[?]" *Id.* at 42.

**7.** West Virginia was one of only seven localities to receive an 'F' grade, the others being the States of Mississippi, New Mexico, Oklahoma, and Texas, the District of Columbia, and Guam.

comply with all statutory and regulatory requirements? Requiring Defendants here to effectively comply necessitates delving into the minutia of the Defendants' day-to-day operations. Clearly the United States Supreme Court now recognizes that fact, as well as the impropriety of following such a course, or beginning with such a premise.

## Analysis

### 1. *The Alleged Eleventh Amendment Bar*

■ Defendants, in their Memorandum of Law in Support of Motion to Dismiss and/or Vacate Previous Orders (hereinafter Memorandum in Support), raise an Eleventh Amendment defense to Plaintiffs' claim and prayer for relief. Defendants rely upon *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1983), for their conclusion that "[t]he Eleventh Amendment bars any action against the State of West Virginia or CSED, a state agency." Memorandum in Support at 4. Defendants further assert that even though Plaintiffs are bringing only an action for injunctive and declaratory relief against state officials in their official capacity, Plaintiffs none-the-less do not meet the requirements of *Ex parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), because:

> (1) [T]he purported claims against the State Secretary, Director, and Commissioner are in reality a poorly disguised claim against the State itself; (2) Congress did not clearly intend to include a private right of action for declaratory and injunctive relief in the remedial scheme it designed for Title IVD; and (3) Title IV–D imposes duties upon contracting States and their agencies only, rather than upon individuals.

Memorandum in Support at 5.

Defendants' objections to the application of *Young* in this matter seem somewhat misguided. *Young* purposefully allows for the circumvention of the Eleventh Amendment's harsh effects in matters exactly like the one currently before this Court. It is readily apparent that state actions are carried out through state officials. Allowing injunctive relief against the state official which alters state action insures that states will abide by the Constitution and other federal law. In this matter Plaintiffs seek to enjoin defendant state officials from acting in alleged violation of federal law. The fact that so enjoining said officials may be tantamount to altering the way the State itself does business does not remove this matter from the protective parameters of *Young.* Therefore, as the Court *previously* ruled in response to Defendants' initial motion seeking summary judgment, filed in October 1989, the Court finds no Eleventh Amendment bar in this matter.

### 2. *Title IV–D's Alleged Comprehensive Remedial Scheme*

■ Defendants seem to suggest that Congress specifically foreclosed a § 1983 remedy for Title IV–D violations by implication in that they created a comprehensive enforcement scheme that is incompatible with § 1983 enforcement. However, the Court must properly defer to the Supreme Court's opinion in *Blessing* which declared "we agree with the Court of Appeals that the Secretary's oversight powers are not comprehensive enough to close the door on § 1983 liability." —— U.S. at ——, 117 S.Ct. at 1363.

### 3. *Blessing v. Freestone (April 21, 1997)*

In *Blessing,* the Supreme Court held that Title IV–D does not generally create enforceable rights on behalf of custodial parents. Likewise, the Court held that custodial parents have no right to compel the State's substantial compliance with all aspects of Title IV–D. However, the Supreme Court "d[id] not foreclose the possibility that some provisions of Title IV–D give rise to individual rights." —— U.S. ——, ——, 117 S.Ct. 1353, 1362, 137 L.Ed.2d 569.[8] *Blessing* re-

---

8. For example, the Court held that § 657(b)(1) may give custodial parents a right to a specific portion of money collected on their behalf. *Blessing,* —— U.S. at ——, 117 S.Ct. at 1362. However, during the oral argument justice O'Connor suggested that while "[t]here may be some individual exceptions within the act, such as where money has in fact been collected and not paid over . . . [such exceptions] might be few and far between." Transcript of Oral Argument, 1997 WL 8589 at 48.

quires parties such as Plaintiffs here to "identify with particularity the rights ... claimed." *Id.* at ——, 117 S.Ct. at 1360. By doing so, plaintiffs allow the court in question to "ascertain whether each separate claim satisfies the various criteria ... [which the Court has] set forth for determining whether a federal statute creates rights." *Id.* Those criteria are: (1) that Congress intended the provision in question to benefit the plaintiff; (2) that the right asserted is not so "vague or amorphous" as to strain judicial competence through enforcement; and (3) that the provision be set in mandatory language. *Wright v. City of Roanoke Redevelopment and Housing Authority,* 479 U.S. 418, 430–432, 107 S.Ct. 766, 773–75, 93 L.Ed.2d 781 (1987); *Wilder v. Virginia Hospital Ass'n,* 496 U.S. 498, 510–511, 110 S.Ct. 2510, 2517–18, 110 L.Ed.2d 455 (1990).

When attempting to determine whether individual plaintiffs are intended as beneficiaries of the statute in question, there seems to be a guiding distinction made between those statutes which prescribe a specific course of conduct to be followed by the State (no individual right), as was the case in *Suter v. Artist M.,* 503 U.S. 347, 112 S.Ct. 1360, 118 L.Ed.2d 1 (1992), and those statutes which specifically enumerate that an individual plaintiff is to receive a personally precise benefit (individual right found), as determined by the Court in *Wilder and Livadas v. Bradshaw,* 512 U.S. 107, 114 S.Ct. 2068, 129 L.Ed.2d 93 (1994).

Two examples of Title IV–D statutes which the Court specifically found do not create individually enforceable rights are 42 U.S.C. § 654a, relating to the detailed requirements of the State's computer system, and 42 U.S.C. § 654(3), regarding the requirement of maintaining sufficient staffing levels. The former was found not to be for the benefit of plaintiffs but rather "simply intended to improve the overall efficiency of the State's child support enforcement scheme," while the latter was found to have far too tenuous a connection between its implementation and the benefit to any one individual to conclude

that Congress intended to give every custodial parent an enforceable right to sufficient levels of staffing. *Blessing,* —— U.S. at ——, 117 S.Ct. at 1361–1362.

### 4. The Brinkley Plaintiffs' Complaint

The Court in *Blessing* concluded that the *Blessing* Respondents, Arizona custodial parents, failed in their original complaint to request little if anything more than a declaration that their rights had been violated and an injunction requiring Petitioner to substantially comply with the requirements of Title IV–D. The Supreme Court found that specific allegations of rights violated had not been made by the Arizona custodial parents. The *Brinkley* Plaintiffs may contend that they have indeed made specific allegations of violations of individual rights, and in support thereof point to the litany of allegations and requests made to the Court over the years. However, it seems quite clear that there may very well come a point where more is less. Just as in *Blessing,* where the prayer for relief requested no more than a declaration that the respondents' rights were being violated and injunctive relief requiring substantial compliance, it can be said that the *Brinkley* Plaintiffs' exhaustive requests for relief seeking the micro-management of the CAO are in fact nothing more than an elaborate request for substantial compliance.

Plaintiffs, in their Response to Defendants' Motion to Dismiss and/or Vacate Previous Orders (hereinafter Plaintiffs' Response), do cite to nine separate examples of what they allege to be violations of individually enforceable rights. *Id.* at 8. However, only three of those allegations are actually present in Plaintiffs' Amended Complaint.

▮▮▮▮ The first of those three allegations claims that Defendants have failed "to identify within 30 days, contact and pursue mandatory collection procedures from delinquent child support obligors in violation of 45 C.F.R. §§ 303.6 and 303.10." *Id.* As a preliminary matter, the Court notes that Plain-

---

Additionally, Justice Scalia, in a concurring opinion in which Justice Kennedy joined, suggested that through the examination of Contract law relating to the rights of third party beneficia-

ries in effect at the time of § 1983's inaction, it may be reasoned that Title IV–D in fact extends no individually enforceable rights. *Blessing,* —— U.S. at ——, 117 S.Ct. at 1364.

tiffs allege only a violation of the C.F.R. and not of any statute. It is a violation of statutory law which is required. The regulations are meant to "fine tune" the statutes in question and are not the sort of laws violation of which give rise to individually enforceable rights under § 1983. Furthermore, § 303.6 requires only that "the IV–D agency ... maintain and use an effective system for ... [e]nforcing the obligation by ... [t]aking any appropriate enforcement action ... unless service of process is necessary, within no more than 30 calendar days of identifying a delinquency or other support-related noncompliance with the order or the location of the absent parent, whichever occurs later." Contrary to Plaintiffs' allegations, § 303.6 does not require identification within 30 days. Further, "appropriate enforcement" is at least as vague as "sufficient staff." Finally, this regulation seems to exist for the purpose of enabling Defendants to become more efficient rather than intending to benefit any specific individual or plaintiff class. For those reasons, the Court finds no individually enforceable right created by this alleged violation.

■ Plaintiffs' second allegation relates to "Defendants' failure to establish paternity by acknowledgment in violation of 45 C.F.R. § 303.5(a)." Plaintiffs' Response at 8. Once again, Plaintiffs have put forward an alleged violation of the Regulations rather than of any specific statute. Section 303.5(a) states that "the IV–D agency must, as appropriate ... provide an alleged father the opportunity to voluntarily acknowledge paternity." The Court finds that the relationship between the benefit that may be derived by obligees and from allowing would be obligors the opportunity, "where appropriate," to voluntarily acknowledge paternity to be too tenuous to conclude that Congress intended to create an enforceable right in obligees in this matter. The Court finds it far more likely that the establishment of paternity by acknowledgment is meant as a method to allow Defendants to improve the overall efficiency of their child support enforcement procedure. For the above reasons, the Court finds no individually enforceable right implicated by the alleged violation.

■ Plaintiffs' third alleged violation relates to "Defendants' failure to pursue enforcement of child support orders in violation of 42 U.S.C. § 654(b) and 45 C.F.R. § 302.33." Plaintiffs' Response at 8. A review of paragraph 25 of Plaintiffs' Amended Complaint reveals that this claim relates to Plaintiffs' equal protection argument, and thus will be addressed below. The other claims for relief proffered by Plaintiffs in their Amended Complaint, however not reiterated in their Response, relate to Defendants' failure to provide adequate staffing (specifically determined by the Court in *Blessing* not to give rise to individual rights), violations of the West Virginia Code, various ethereal equal protection claims, and further violations of the C.F.R. which relate to the establishment of paternity (Plaintiffs' Amended Complaint at paragraph 30(b)) and which the Court finds to have been established for the purposes of guiding Defendants toward an efficient system rather than for the benefit of any specific individual. Likewise, there is an allegation of Defendants' failure to fully comply with the regulations. As *Blessing* has established, there exists no individual right to such compliance.

As Plaintiffs acknowledge, the other six allegations noted in Plaintiffs' Response do not appear in Plaintiffs' fifteen page Amended Complaint. *Blessing* directs the District Court to return to the Complaint to ascertain which specific statutes are alleged to have been violated, and whether violations of those statutes give rise to individually enforceable rights. Plaintiffs' remaining specifically noted allegations simply do not appear in the complaint, and therefore should not be considered as the basis for satisfying the requirements of *Wright and Wilder.* Therefore, under the now apparent standard of *Blessing,* injunctive relief should not have been granted to redress the alleged violations not maintained in Plaintiffs' Amended Complaint. As such relief was granted, the Court shall take a moment to examine those additional claims highlighted by Plaintiffs in their Response.

### a. *The Remaining Claims*

Assuming arguendo that Plaintiffs' other claims depicted in their response had proper-

ly been included in the complaint, the Court none-the-less finds that the vast majority clearly fail to implicate the violation of individually guaranteed rights giving rise to an individual claim for relief.

■ In their Amended Motion for Preliminary Injunction, Plaintiffs claim that Defendants' failure to develop and use a comprehensive intake form is an individually redressable violation of 42 U.S.C. §§ 652, 654 and 45 C.F.R. § 303.2. Plaintiffs fail to pinpoint within either § 652 or § 654 the exact location of the statutory language furnishing custodial parents the right to a comprehensive intake form. 45 C.F.R. § 303.2(b)(1) states simply that the Title IV–D agency shall establish an adequate case record by "[s]olicit[ing] necessary and relevant information from the custodial parent and other relevant sources ..." There appears no mention of comprehensive intake forms nor the requirement that such forms solicit any specific information pertaining to the personal or real property of the obligor. Regardless, any requisite use of such form does not strike the Court as creating individually enforceable rights in custodial parents. As an initial observation, the Court notes that it is the custodial parent who is supplying the information. So it appears that Plaintiffs are seeking to enforce their alleged right to provide comprehensive information to the Defendants. There is no claim that Defendants prevent Plaintiffs from providing this information. Rather, Plaintiffs are simply requesting that the Court require Defendants to streamline their operation and make the process of asset location more efficient. The use of an appropriate intake form appears "intended to improve the overall efficiency of the State's child enforcement scheme," and not specifically intended to bestow any individual rights upon the plaintiff class. — U.S. at ——, 117 S.Ct. at 1361. Additionally, as the Supreme Court reasoned with regard to increased staffing, the relationship between a comprehensive intake form and the benefit to any specific individual is far too removed to conclude that Congress intended to create the right to such a form in any individual. Accordingly, the Court finds that Title IV–D cre-

ates no individually enforceable right to the development or use of any specific intake form.

■ Plaintiffs further allege that Defendants have failed to employ all available legal remedies for the collection of past due support in violation of 42 U.S.C. § 666. Section 666 is headed "Requirements of statutorily prescribed procedures to improve effectiveness of child support enforcement." (Emphasis added). Section 666's requirements include nineteen separate procedures, each with accompanying subsections. Subsection (d) declares that a state may qualify for an exemption to those requirements if it "demonstrates to the satisfaction of the Secretary ... that the enactment of any law or the use of any procedure or procedures required by or pursuant to this section will not increase the effectiveness and efficiency of the State child support enforcement program ..." Therefore, having reviewed the language of section 666, the Court finds that Congress did not intend Plaintiffs to be the beneficiary of those regulations (and additionally finds the regulations not completely set in mandatory language), but rather intended § 666 to serve as a guideline to help the states improve their processes of efficient collection.

■ Plaintiffs additionally allege that Defendants have violated their specifically enumerated rights by failing or refusing to take action against employers who fail to enforce wage withholding. As authority, Plaintiffs cite exclusively to the provisions of 45 C.F.R. § 303.100(d)(vi). The current version of 45 C.F.R. § 303.100 does not include a subsection (d)(vi), however, subsection (f)(1) delineates the requirements of proper notice, which must be sent to employers prior to the initiation of withholding. Subsection (f)(1)(vi) declares that the State must notify the employer that their "fail[ure] to withhold wages in accordance with the provisions of the notice ... [subjects the employer to] liab[ility] for the accumulated amount the employer should have withheld from the absent parent's wages." The Court finds that such language is far removed from that which, under the proper analysis, can be said to create rights in the custodial parent. Rather than being for the predominant bene-

fit of the custodial parent, the above language serves the purpose of clearly advising employers of their duties and of consequences attached to failing to perform as required. Additionally, other language of section 303.100 seems to clearly be for the benefit of the obligor in that it seeks to insure that withholding will not be undertaken imprudently, and that the fact of withholding alone will not result in the unfavorable treatment of the obligor.[9]

Plaintiffs also allege in their Amended Motion for Preliminary Injunction that Defendants have failed or refused to use proper locator and search methods in violation of 42 U.S.C. § 653. Section 653(a) declares that **the Secretary** shall establish a Federal Parent Locator Service which shall be made available to authorized users which include Defendants. (Emphasis added). It appears that Plaintiffs are alleging Defendants failure to take advantage of the system, however, 42 U.S.C. § 653 does not clearly require the use of such a system but only the creation and maintenance of such a system by the Secretary. It is apparent that, rather than creating an enforceable right in custodial parents requiring the use of the Federal Parent Locator Service, the Statute is intended to assist states in complying with the requirements of their State Plans.

Plaintiffs further claim that Defendants' "failure to assure that the obligee receives past support due prior to reimbursement for AFDC benefits" is a violation of 45 C.F.R. § 302.51(a). The current version of 45 C.F.R. § 302.51(a) does not detail the requirements of payment for past due support with relation to reimbursement. Subsection (b)(1) states that "the first $50 of any payments for a month received in that month, and the first $50 of payments for each prior month received in that month which were made by the absent parent **in the month when due,** shall be paid to the family." (Emphasis added). That same subsection goes on to say "[i]f the amount collected includes payment on the required support obligation for a previous month or months,

the family shall **only receive the first $50 of the amount which represents the required support obligation for the month in which support was collected.**" (Emphasis added). The precise violation claimed by Plaintiffs is a bit unclear, however, the Court reads the allegation to declare that when the State receives a lump sum payment in one month which represents payments owed in prior months, the State is required to send the custodial parent in question $50 for each of the prior months collected. The regulatory language does not seem to provide for such a right. In this matter, the Court agrees with the Ninth Circuit's opinion in *Vanscoter v. Sullivan,* 920 F.2d 1441 (9th Cir.1990), which failed to find any specific right of plaintiffs to receive a $50 pass through for every prior month's support when said support was past due and collected in a month other than the month in which it was properly to be paid.

Clearly the most intriguing of Plaintiffs' claims is that which declares Defendants' failure to provide adequate and timely notice of support collections and calculations of offsets and payments to be in violation of 42 U.S.C. § 657. Had such a claim been properly presented in Plaintiffs' Amended Complaint, it would have afforded Plaintiffs the best possibility of success under the standards of *Blessing, Wright, and Wilder.* While the requirement that the State provide notice may be one step removed from the requirement that the state provide the actual fifty dollar pass through, it none-the-less strikes the Court as a benefit to be personally enjoyed by Plaintiffs. If any problem arises, it is within the "adequate and timely" provision claimed by Plaintiffs. However, those provisions are not necessarily so vague and amorphous as to strain judicial competence with regard to enforcement. This situation is, however, made more precarious in the case at bar by the fact that Defendants now provide notice of all monies collected and distributed accept for arrearages, which the Court has excepted Defendants from providing until such time as the proper data reconversion has been completed.

9. As an example, see subsection (f)(1)(v) which states that "the employer is subject to a fine to be determined under State law for discharging an absent parent from employment, refusing to employ, or taking disciplinary action against any absent parent because of the withholding[.]"

### 5. The Equal Protection Argument

 Plaintiffs' Amended Complaint contains a number of vague references to the disparate treatment of non-PA recipients as opposed to PA recipients. As a preliminary matter, the Court notes that non-PA recipients, which encompass the vast majority of the United States population, do not comprise a suspect class. Those with a standard of living high enough to thankfully keep them off of the welfare roles do not as a whole have any of the traditional characteristics of repression that are often equated with suspect classification. Likewise, contrary to Plaintiffs' assertions, there is no fundamental right to child support. Thus the equal protection violation is being claimed by a non-suspect class with regard to an alleged deprivation of a non-fundamental right.

 Further, plaintiffs in a § 1983 action who claim an equal protection violation must "prove that the defendant acted in a discriminatory manner and that the discrimination was intentional." *Federal Deposit Insurance Corporation v. Henderson*, 940 F.2d 465, 471 (9th Cir.1991). Plaintiffs' Amended Complaint does little more than allege that non-PA applicants fail to receive certain types of service. There is little in the way of specific corresponding allegations to show that PA applicants received those services when non-PA applicants did not. There are some vague references to services that PA applicants received more thoroughly than did non-PA applicants, but even those allegations fail to meet the standard set forth in *Henderson* in that they wholly fail to allege any discriminatory intent.

 However, beyond all of the above is the simple fact that if there indeed was any disparate treatment in the past, none remains today. It has been years since any serious discrimination against non-PA applicants has been alleged. In a report prepared by the Implementation Coordinator and submitted to the Court on September 4, 1997, Defendants received a rating of "excellent" in regards to equal treatment among PA and non-PA applicants. Therefore, the Court simply finds that the issue of equal protection has become moot, and therefore there no longer exists an adequate reason for maintaining any preliminary injunction requiring equal treatment which is now customarily provided.

### 6. Defendants' Alleged Violations of Plaintiffs' Due Process Rights

As with numerous other allegations submitted by Plaintiffs, the Court finds that no Due Process claim was made by in the Amended Complaint, and, therefore finds that such a claim is unable to support the Court's retention of this matter.

### Conclusion

The relief originally sought by Plaintiffs in their Amended Complaint was in actuality quite modest. However, the requests and requirements spawned therefrom were anything but. Relief was sought and granted which in no way could be attributable to the relief sought in Plaintiffs' Amended Complaint. And thus it is evident to the Court that over the past nine years it has slowly gravitated into what amounts to little more than the micro-management of the CAO. A thorough review of the history of this action reveals that Plaintiffs have sought and the Court has Ordered substantial compliance by the Defendants with Title IV–D. Through *Blessing* the Supreme Court has for the first time made it abundantly clear that such generalized relief is unavailable.

The Court does not believe that its efforts over the past nine years have been in vain. Although micro-management is neither a task that this Court enjoys nor seeks to fulfill, it cannot help but believe that the human side of this litigation, namely the thousands of custodial parents rightfully owed but unforgivably denied child support, gave the Court its motivation to do its best to lend assistance toward achieving a goal of compliance, and prompt delivery of much needed support. This Order is not an invitation to the CAO to return to the days when compliance and enforcement were shunned. Compliance is essential. Rather, Defendants should make every reasonable effort to ensure that they live up to the requirements of the statutory and regulatory provisions guiding their receipt of federal funds. However, a federal court is not the proper enforcer of

those mandates. That is the job of the United States Secretary of Health and Human Services, and of the Child Support Enforcement Commission, the *watchdog group* created by the West Virginia State Legislature in 1995 and charged with the duty of overseeing the Child Support Enforcement Division. As was stated by Justices O'Connor and Souter, the Court has no business duplicating the compliance efforts of other competent entities, and thus the Court finds it should pass the torch. In doing so, the Court presumes that the Child Support Enforcement Commission will exercise due diligence in the performance of its statutory responsibilities.

The Court does not specifically find that Title IV–D fails to create individually enforceable rights, rather only that the alleged violations proffered by Plaintiffs in their Amended Complaint do not meet the tests depicted in *Blessing, Wright or Wilder.* The Court would also like to take a moment to relate that it found Defendants' briefs to be of no help to the Court in reaching its conclusions with regard to the instant matter. Rather than focus on the essential concern, namely a breakdown of Plaintiffs' Amended Complaint, Defendants spent a majority of their efforts championing Eleventh Amendment and Comprehensive Remedial Scheme arguments that clearly had previously been decided in Plaintiffs' favor. In the future the Court hopes Defendants can remain properly focused.

Therefore, as the Court finds that Plaintiffs have failed to allege any violations of enforceable rights, and that there exist no grounds upon which the Court can grant relief, the Court hereby **ORDERS** that this matter be **DISMISSED,** and further **ORDERS** that all previous Orders in this matter be **VACATED.** Correspondingly, **all outstanding motions** in this matter are **ORDERED DENIED** for lack of jurisdiction.