# IN THE COURT OF APPEALS OF TENNESSEE, AT NASHVILLE

**FILED**

**March 31, 2000**

**Cecil Crowson, Jr.
Appellate Court Clerk**

|   |   |   |
|---|---|---|
| **PATRICIA DAVIS, and JENNIFER ARIC, for themselves and on behalf of all persons similarly situated**, | ) ) ) ) | Davidson County Chancery Court No. 92-3314-I |
| Plaintiffs/Appellants, | ) ) | |
| AND | ) ) | |
| **GINA EUBANKS**, | ) ) | |
| Plaintiff, | ) ) | |
| VS. | ) ) | C.A. No. M1999-00066-COA-R3-CV |
| **MIKE O'HARA, Acting Director**, **Child Support Services, Tennessee Department of Human Services**, | ) ) ) ) | |
| Defendant/Appellee. | ) ) | |

From the Chancery Court of Davidson County at Nashville.
**Honorable Irvin H. Kilcrease, Jr., Chancellor**

**Harris A. Gilbert**, WYATT, TARRANT & COMBS, Nashville, Tennessee
**Brian Paddock**, Cookeville, Tennessee
Attorneys for Plaintiffs/Appellants

**Paul G. Summers**, Attorney General & Reporter
**Stuart F. Wilson-Patton**, Assistant Attorney General
Attorneys for Defendant/Appellee

OPINION FILED:

**AFFIRMED AND REMANDED**

**FARMER, J.**

**CRAWFORD, P.J., W.S.**: (Concurs)
**HIGHERS, J.**: (Concurs)

Plaintiffs Patricia Davis and Jennifer Aric appeal the trial court's judgment dismissing their civil rights claims against Defendant/Appellee Mike O'Hara, Acting Director, Child Support Services, Tennessee Department of Human Services. Relying upon the United States Supreme Court's opinion in **Blessing v. Freestone**, 520 U.S. 329 (1997), the trial court dismissed the Plaintiffs' 1983[1] claims based upon the court's ruling that the Plaintiffs had failed to assert any enforceable private right of action under the provisions of Title IV-D of the Social Security Act. After reviewing the allegations of the Plaintiffs' amended complaint, we conclude that the trial court properly dismissed the Plaintiffs' claims against the Director of Child Support Services, and we affirm the trial court's judgment.

### I. Factual and Procedural History of Plaintiffs' 1983 Claims

This appeal presents the second opportunity for this court to rule on the trial court's dismissal of Plaintiff Patricia Davis's 1983 claims against the Director of Child Support Services for the Tennessee Department of Human Services. In her original complaint, Davis and three other plaintiffs alleged that the Director and other state agents had failed to provide them with child support services as required by Title IV-D of the Social Security Act. The trial court dismissed the original plaintiffs' 1983 claims based upon its ruling that the plaintiffs had no private right of action to enforce any rights allegedly arising under Title IV-D, also known as the Child Support Enforcement Act.

On appeal, this court reversed the trial court's dismissal of the plaintiffs' claims. In **Davis v. McClaran**, No. 01A01-9304-CH-00164, 1993 WL 523667, at *5 (Tenn. Ct. App. Dec. 10, 1993) (**Davis I**), we held that the plaintiffs had "an enforceable right under Title IV-D to receive services from a Title IV-D program that follows federally required procedures in at least 75 percent of cases." We based this holding, in part, upon Title IV-D's requirement that, in order to receive the full amount of federal funding available, a state must substantially comply with the requirements of

---

[1]**See** 42 U.S.C.A. § 1983 (West 1994) (providing that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress").

Title IV-D. *See Davis I*, 1993 WL 523667, at *3 (citing 42 U.S.C. 603(h)(1)). The regulations in effect indicated that a state was in substantial compliance if it complied with the requirements of Title IV-D in seventy-five percent (75%) of cases handled. *See Davis I*, 1993 WL 523667, at *3; *see also* 45 C.F.R. § 305.20 (1993).

The Supreme Court of Tennessee affirmed our reinstatement of the plaintiffs' 1983 action. *See Davis v. McClaran*, 909 S.W.2d 412, 420-21 (Tenn. 1995) (*Davis II*).[2] In doing so, the supreme court agreed with this court's holding that the plaintiffs had enforceable rights to receive Title IV-D benefits from the state. *See Davis II*, 909 S.W.2d at 416. The supreme court modified our decision, however, by holding that a plaintiff could bring a 1983 action against the state to enforce its direct obligations to the plaintiff under Title IV-D regardless of whether the state was in substantial compliance with Title IV-D's requirements. *See id*. at 420. Thus, our supreme court recognized that Title IV-D could give rise to enforceable individual rights to receive child support services independent of Title IV-D's substantial compliance provisions. *See id*. The Supreme Court of the United States subsequently denied the Director's petition for certiorari. *See McClaran v. Davis*, 517 U.S. 1128 (1996).

After this case was remanded to the trial court, Patricia Davis was the only original plaintiff who continued to participate in this litigation.[3] Davis, along with two new plaintiffs, including Appellant Jennifer Aric,[4] filed an amended complaint in the trial court in which they alleged that the Director had failed to provide them with child support services in violation of the provisions of Title IV-D. With regard to the Director's failure to provide Title IV-D services to

---

[2]The supreme court also affirmed the trial court's and this court's dismissals of the plaintiffs' requests for declaratory relief and a writ of mandamus, agreeing "that § 1983 is an adequate remedy, thus obviating the need for a writ of mandamus, an extraordinary remedy; and that § 1983 provides a better and more efficient remedy than a declaratory judgment." *Davis II*, 909 S.W.2d at 420 n.8.

[3]On remand, Joyce McClaran's successor, Glenda Shearon, was automatically substituted as the defendant in this action. Pending this appeal, the current defendant, Mike O'Hara, was substituted as a party. *See* Tenn. R. Civ. P. 25.04(1) (providing that "[w]hen an officer of the State, a county, a city or other governmental agency is a party to an action in the officer's official capacity and during its pendency dies, resigns, or otherwise ceases to hold the office, the action does not abate and the officer's successor is automatically substituted as a party").

[4]The plaintiffs named in the amended complaint also included Gina Eubanks, but she is not a party to this appeal.

Patricia Davis, the complaint made the following allegations:

46.     Plaintiff Patricia Davis gave birth to Latasha Davis on June 30, 1979. Ms. Davis has not been married to Latasha's father, Billy Stewart, and she received AFDC for Latasha after the child was born. Ms. Davis sought assistance from the [District Attorney General (DAG) for the Twentieth Judicial District of Tennessee] in establishing paternity and setting a support obligation while Latasha was still an infant.

47.     Eventually, in 1983 or 1984, the DAG's agents assisted Ms. Davis in establishing that Mr. Stewart is Latasha's father. The DAG's child support office agents made no effort to establish a child support obligation until 1991 when they filed a petition to set support in the Juvenile Court of Davidson County. Following a hearing on October 29, 1991, the Juvenile Court for Davidson County entered an order requiring Mr. Stewart to pay support in the amount of $142 per month by income assignment. The Clerk of Court was unable to serve the income assignment order, and Mr. Stewart failed to make any child support payments directly to the Clerk of Court. Despite knowing Mr. Stewart's home address, the DAG's child support program made no efforts to enforce the child support order to the time this action was filed.

48.     Ms. Davis has advised the child support agency that Mr. Stewart now receives Social Security Disability payments. Social Security Disability payments are subject to income withholding to pay child support. Ms. Davis now receives only food stamps. Ms. Davis receives no Families First assistance because she cannot work. She must provide constant care for Latasha who has such serious asthma that she is frequently admitted to the hospital. Upon information and belief the [Director] and [his] agents have taken no action to effectuate the income withholding order for support for Ms. Davis and Latasha.

49.     Plaintiff Davis has another child, Thaddeus Davis, born on August 23, 1982. Ms. Davis has not been married to the child's father, Thaddeus Kenneth Smyer. She received AFDC benefits for the child after he was born. Ms. Davis provided Mr. Smyer's home address and likely place of employment within Davidson County to the DAG's agents. This information was never acted upon to establish a paternity or support order for Thaddeus Davis.

50.     The DAG's agents refused to allow Ms. Davis' then counsel to review the child support file on her or to provide information as to the case status or the actions of the child support agency. On information and belief, [the Director's] agents did nothing to enforce the child support obligations of Mr. Stewart or to establish the child support obligation of Mr. Smyer.

51.     In November 1997, Ms. Davis sought the help of a private attorney to obtain child support. The private attorney contacted the child support agency and provided the most recent information concerning Ms. Davis' child support cases, including the Social Security number of Thaddeus Kenneth Smyer. On information and belief, [the Director] and [his] local child support agents have not taken any steps to enforce the child support obligations of Mr. Stewart or to establish the child support obligation of Mr. Smyer.

With regard to the Director's failure to provide Title IV-D services to Jennifer Aric, the amended complaint made the following allegations:

56. Plaintiff Jennifer Aric is the mother of Julia Aric, born July 29, 1993. Ms. Aric was receiving welfare aid at the time Julia was born, but the [Director] failed to establish paternity although the non-custodial parent was in custody and paternity could have been established within the time limits set by federal law. A court order for child support was entered in March 1995 for $80 per month to be paid by the non-custodial parent Anthony Nolley. The non-custodial parent has made only two payments since the entry of the order. Upon information and belief, the [Director] failed to promptly identify the failure of the non-custodial parent to timely pay support and failed to take the enforcement actions required by federal law.

57. In 1996 Ms. Aric repeatedly requested enforcement of the support order over a period of many months. Eventually the [Director's] contract IV-D agency MAXIMUS filed a motion for contempt to enforce the order. Ms. Aric called the MAXIMUS office the day before the hearing, as she had been instructed to do. She was told that the non-custodial parent had been served and so she took time off work to attend the hearing. Ms. Aric appeared at the courthouse for the motion. After several hours delay, she was told that the non-custodial parent had not been served. She was then told by the MAXIMUS representative that it was her duty to locate the non-custodial parent and that she had failed in this duty. Ms. Aric has not had contact with the non-custodial parent since they separated because he had abused Julia. This demand upon her to perform the location activity which federal law requires the [Director] to perform was delivered before other persons assembled for child support case hearings and greatly embarrassed Ms. Aric.

58. The [Director] and [his] agents are aware of the Social Security number of the non-custodial parent. In February 1998, Ms. Aric was notified by the Internal Revenue Service that the non-custodial parent had claimed Julia Aric as a dependent on his tax return for 1997 despite the fact that he had paid no child support. The information as to the current address and employment of the non-custodial parent is available to the [Director] upon request, but will not be made available by IRS to Ms. Aric.

59. Ms. Aric reported to MAXIMUS that the IRS had recent location and employment information on the non-custodial parent and requested that they locate the non-custodial parent. She was told that her case was, and had been in "locate" since 1997, but that she would not be told if any location action had been taken or if any location information had been received. . . .

60. Jennifer Aric is also the mother of Hanna Aric, born February 27, 1992. Hanna's father is Kevin Jennings. In July 1997, the non-custodial parent was ordered to pay $182 every two weeks by wage assignment. The [Director] failed to obtain any support for the time prior to the entry of the order. The [Director] has collect[ed] child support by wage assignment forwarded by the non-custodial parent's employer. The [Director] has not sent the full amount collected as child support to Ms. Aric as required by federal law.

Based upon the foregoing allegations, the Plaintiffs' amended complaint claimed that the Director, in violation of 42 U.S.C. § 1983, had deprived the Plaintiffs of their rights under Title IV-D of the Social Security Act and the related implementing regulations by (1) failing to provide parent location services as required by 42 U.S.C. §§ 654(4) and 654(8) and 45 C.F.R. §§ 303.3, 303.7, and 303.100 (count I); (2) failing to provide services to establish child support orders as required by 42 U.S.C. §§ 602(a)(2), 652(a)(1), 652(a)(2), 652(h), 654(4), and 654(13) and 45 C.F.R. §§ 302.50, 303.4, and 303.5 (count II); and (3) failing to provide services to enforce child support orders as required by 42 U.S.C. §§ 652(a)(1), 652(a)(2), 652(h), 654(4), and 654(13) and 45 C.F.R. § 303.6 (count III). As part of their third claim for relief, the Plaintiffs additionally asserted that they were entitled to receive the benefits of the income withholding procedures set forth in 42 U.S.C. §§ 666(b)(6)(A)(i), 666(b)(6)(A)(iii), 666(b)(8), and 666(b)(11). In a fourth claim for relief, the Plaintiffs asserted that the Director had violated their due process rights under the Fourteenth Amendment to the United States Constitution and Article I, Section 8 of the Tennessee Constitution by failing to provide the Plaintiffs with notice regarding the status of their cases or to allow the Plaintiffs' counsel to inspect their child support files (count IV). The Plaintiffs' amended complaint requested the following relief:

> 1. That this action be certified as a class action;[5]
>
> 2. That plaintiffs be awarded preliminary and permanent injunctive relief requiring [the Director] to provide child support services as required by Title IV-D of the Social Security Act and its implementing regulations and to make available information as to case status sufficient to allow custodial parents to protect their interests in child support;
>
> 3. That the court declare that [the Director] is obligated to provide child support services meeting the requirements of Title IV-D of the Social Security Act and that [the Director] has failed to fulfill that duty;
>
> 4. That [the Director] be ordered to pay the cost of this cause, including plaintiffs' reasonable attorney fees; and
>
> 5. For such other or additional relief as the court finds to be just and proper.

---

[5]*See* Tenn. R. Civ. P. 23.

The Director responded to the Plaintiffs' amended complaint by filing a motion to dismiss that asserted several grounds for dismissal of the Plaintiffs' complaint. In the motion to dismiss, the Director again contended that the Plaintiffs' complaint failed to state a cause of action, *see* Tenn. R. Civ. P. 12.02(6), because the Plaintiffs had "failed to assert a violation of an individually enforceable right under Title IV-D of the Social Security Act." Although our supreme court had rejected this argument in *Davis II*, the Director again raised it because, after our supreme court decided *Davis II* and after the United States Supreme Court denied certiorari in that case, the Supreme Court decided *Blessing v. Freestone*, 520 U.S. 329 (1997), which directly addressed the issue of whether Title IV-D's provisions gave rise to individual rights that could be enforced by bringing a 1983 action against the state.

After conducting a hearing, the trial court again dismissed the Plaintiffs' complaint. Citing the Supreme Court's intervening decision in *Blessing v. Freestone*, 520 U.S. 329 (1997), the trial court ruled that, "based upon *Blessing*, this Court, having reviewed each asserted/alleged right, is of the opinion that plaintiffs have not asserted enforceable private rights of action under Title IV-D." In its order of dismissal, the trial court denied the Plaintiffs' request for class certification based upon the court's ruling that the request was moot.

On appeal, the Plaintiffs agree that the Supreme Court's decision in *Blessing v. Freestone*, 520 U.S. 329 (1997), controls the outcome of this case. The Plaintiffs insist, however, that the trial court misinterpreted the *Blessing* decision to hold that the Plaintiffs had no enforceable private right of action under Title IV-D. The Plaintiffs contend that, contrary to this ruling, *Blessing* recognized that Title IV-D may give rise to some individual rights that can be enforced through a 1983 action. The Plaintiffs further contend that, as directed by *Blessing*, they have identified with particularity the individually enforceable rights which they claim were conferred upon them by the provisions of Title IV-D.

## II. *United States Supreme Court's Decision in* Blessing v. Freestone

In *Blessing v. Freestone*, 520 U.S. 329, 340 (1997), the Supreme Court of the United States reaffirmed the principle that a plaintiff may bring a 1983 action to enforce individual rights

created by a federal statute. The Court cautioned, however, that, in order to maintain such an action, "a plaintiff must assert the violation of a federal *right*, not merely a violation of federal *law*." *Blessing*, 520 U.S. at 340 (emphases added). The Court then set forth the traditional test for determining whether a federal statute creates an individually enforceable right:

> We have traditionally looked at three factors when determining whether a particular statutory provision gives rise to a federal right. First, Congress must have intended that the provision in question benefit the plaintiff. [*Wright v. Roanoke Redev. & Hous. Auth.*, 479 U.S. 418, 430 (1987)]. Second, the plaintiff must demonstrate that the right assertedly protected by the statute is not so "vague and amorphous" that its enforcement would strain judicial competence. [*Id*. at 431-32]. Third, the statute must unambiguously impose a binding obligation on the States. In other words, the provision giving rise to the asserted right must be couched in mandatory rather than precatory terms. [*Wilder v. Virginia Hosp. Ass'n*, 496 U.S. 498, 510-11 (1990)].

*Blessing*, 520 U.S. at 340-41.

If a plaintiff demonstrates, by applying the foregoing three-part test, that a federal statute creates an individual right, a rebuttable presumption arises that the right is enforceable under 1983. *See Blessing*, 520 U.S. at 341. A defendant may rebut this presumption by demonstrating that Congress, either expressly or impliedly, foreclosed a remedy under 1983. *See id*. (citing *Smith v. Robinson*, 468 U.S. 992, 1005 n.9 (1984)). The Supreme Court explained that Congress may foreclose a remedy "expressly, by forbidding recourse to § 1983 in the statute itself, or impliedly, by creating a comprehensive enforcement scheme that is incompatible with individual enforcement under § 1983." *Blessing*, 520 U.S. at 341 (citing *Livadas v. Bradshaw*, 512 U.S. 107, 133 (1994)).

Because the application of the foregoing analysis requires a thorough examination of the federal statute involved, the Supreme Court succinctly described the existing provisions of Title IV-D:

> To qualify for federal AFDC [Aid to Families with Dependent Children] funds, the State must certify that it will operate a child support enforcement program that conforms with the numerous requirements set forth in Title IV-D of the Social Security Act, 42 U.S.C.A. §§ 651–669b (Nov. 1996 Supp.), and will do so pursuant to a detailed plan that has been approved by the Secretary of Health and

Human Services (Secretary). § 602(a)(2); *see also* § 652(a)(3). The Federal Government underwrites roughly two-thirds of the cost of the State's child support efforts. § 655(a). But the State must do more than simply collect overdue support payments; it must also establish a comprehensive system to establish paternity, locate absent parents, and help families obtain support orders. §§ 651, 654.

A State must provide these services free of charge to AFDC recipients and, when requested, for a nominal fee to children and custodial parents who are not receiving AFDC payments. §§ 651, 654(4). AFDC recipients must assign their child support rights to the State and fully cooperate with the State's efforts to establish paternity and obtain support payments. Although the State may keep most of the support payments that it collects on behalf of AFDC families in order to offset the costs of providing welfare benefits, until recently it only had to distribute the first $50 of each payment to the family. 42 U.S.C. § 657(b)(1). The amended version of Title IV-D replaces this $50 pass-through with more generous distributions to families once they leave welfare. 42 U.S.C.A. § 657(a)(2) (Nov. 1996 Supp.). Non-AFDC recipients who request the State's aid are entitled to have all collected funds passed through. § 657(a)(3). In all cases, the State must distribute the family's share of collected support payments within two business days after receipt. § 654b(c)(1).

The structure of each State's Title IV-D agency, like the services it provides, must conform to federal guidelines. For example, States must create separate units to administer the plan, § 654(3), and to disburse collected funds, § 654(27), each of which must be staffed at levels set by the Secretary, 45 CFR § 303.20 (1995). If a State delegates its disbursement function to local governments, it must reward the most efficient local agencies with a share of federal incentive payments. 42 U.S.C.A. § 654(22) (Nov. 1996 Supp.). To maintain detailed records of all pending cases, as well as to generate the various reports required by federal authorities, States must set up computer systems that meet numerous federal specifications. § 654a. Finally, in addition to setting up this administrative framework, each participating State must enact laws designed to streamline paternity and child support actions. §§ 654(20), 666.

To oversee this complex federal-state enterprise, Congress created the Office of Child Support Enforcement (OCSE) within the Department of Health and Human Services (HHS). This agency is charged with auditing the States' compliance with their federally approved plans. Audits must occur at least once every three years, or more often if a State's performance falls below certain standards. § 652(a)(4). If a State does not "substantially comply" with the requirements of Title IV-D, the Secretary is authorized to penalize the State by reducing its AFDC grant by up to five percent. § 609(a)(8). The Secretary has interpreted "substantial compliance" as: (a) full compliance with requirements that services be offered statewide and that certain recipients be notified monthly of the support collected, as well as with reporting, recordkeeping, and accounting rules; (b) 90 percent compliance with case opening and case closure criteria; and (c) 75 percent compliance with most remaining program requirements. 45 CFR § 305.20 (1995). The Secretary may suspend a penalty if the State implements an adequate corrective action plan,

and if the program achieves "substantial compliance," she may rescind the penalty entirely. 42 U.S.C.A. § 609(c) (Nov. 1996 Supp.).

*Blessing*, 520 U.S. at 332-35 (footnote omitted).

In *Blessing*, five Arizona mothers brought a 1983 action against the Director of the Arizona Department of Economic Security, the state agency charged with providing child support services under Title IV-D. *See Blessing*, 520 U.S. at 337. Some of the claimants received AFDC benefits, and all of them had children who were eligible for Title IV-D child support services. *See id*. In their complaint, the claimants alleged "that they had properly applied for child support services but that, despite their good faith efforts to cooperate, the [state] agency never took adequate steps to obtain child support payments from the fathers of their children." *Id*. The claimants attributed these omissions to "structural defects in the State's child support efforts," including "staff shortages, high caseloads, unmanageable backlogs, and deficiencies in the State's accounting methods and recordkeeping." *Id*.

In fact, Arizona's poor record of enforcing child support obligations and its failure to substantially comply with significant Title IV-D program requirements were well documented. *See Blessing*, 520 U.S. at 335-36 & n.2. In their complaint, the claimants "sought to represent a class of all children and custodial parents residing in Arizona who [were] or [would] be entitled to Title IV-D services." *Id*. In support of their 1983 action, the claimants asserted that Title IV-D granted them "individual rights to all mandated services delivered in substantial compliance with Title IV-D and its implementing regulations." *Id*. at 341. In addition to seeking other relief, the claimants asked the trial court to issue an injunction requiring the director of Arizona's child support agency to achieve "substantial compliance" throughout all operations of the agency's child support enforcement program. *See id*.

The trial court dismissed the claimants' 1983 action, but a divided panel of the United States Court of Appeals for the Ninth Circuit reversed, concluding "that [the claimants] could sue [the director] under § 1983 to bring Arizona's child support enforcement program into substantial compliance with federal law." *Blessing*, 520 U.S. at 339 (citing *Freestone v. Cowan*, 68 F.3d 1141,

1150 (9th Cir. 1995)). The United States Supreme Court granted certiorari "to resolve disagreement among the courts of appeals as to whether individuals may sue state officials under § 1983 for violations of Title IV-D." *Blessing*, 520 U.S. at 339-40.

The Supreme Court vacated the Court of Appeals' judgment and remanded the case for further proceedings consistent with the Supreme Court's opinion. *See Blessing*, 520 U.S. at 349. In its opinion, the Supreme Court first criticized the Court of Appeals' holding that Title IV-D created individually enforceable rights without specifying "exactly which 'rights' it was purporting to recognize." *Id*. at 342. The Supreme Court explained:

> As an initial matter, the lower court's holding that Title IV-D "creates enforceable rights" paints with too broad a brush. It was incumbent upon [the claimants] to identify with particularity the rights they claimed, since it is impossible to determine whether Title IV-D, as an undifferentiated whole, gives rise to undefined "rights." Only when the complaint is broken down into manageable analytic bites can a court ascertain whether each separate claim satisfies the various criteria we have set forth for determining whether a federal statute creates rights. . . .
>
> In prior cases, we have been able to determine whether or not a statute created a given right because the plaintiffs articulated, and lower courts evaluated, well-defined claims. . . .
>
> The Court of Appeals did not engage in such a methodical inquiry. As best we can tell, the Court of Appeals seemed to think that [the claimants] had a right to require the director of Arizona's child support agency to bring the State's program into substantial compliance with Title IV-D.

*Blessing*, 520 U.S. at 342-43 (citations omitted).

Apparently, the only statutory provisions identified by the claimants and the Court of Appeals were those requiring the state to operate its child support program in "substantial compliance" with Title IV-D. Accordingly, the Supreme Court next considered whether these statutory provisions gave rise to individually enforceable rights. *See Blessing*, 520 U.S. at 335, 343-44 (citing 42 U.S.C.A. §§ 609(a)(8), 609(c) (Nov. 1996 Supp.); 42 U.S.C. § 652(g)). Contrary to the Court of Appeals' holding, the Supreme Court held that Title IV-D's substantial compliance provisions did not create individually enforceable rights. *See Blessing*, 520 U.S. at 343-44. The Court explained:

[T]he requirement that a State operate its child support program in "substantial compliance" with Title IV-D was not intended to benefit individual children and custodial parents, and therefore it does not constitute a federal right. Far from creating an individual entitlement to services, the standard is simply a yardstick for the Secretary to measure the systemwide performance of a State's Title IV-D program. Thus, the Secretary must look to the aggregate services provided by the State, not to whether the needs of any particular person have been satisfied. A State substantially complies with Title IV-D when it provides most mandated services (such as enforcement of support obligations) in only 75 percent of the cases reviewed during the federal audit period. 45 CFR § 305.20(a)(3)(iii) (1995). States must aim to establish paternity in 90 percent of all eligible cases, but may satisfy considerably lower targets so long as their efforts are steadily improving. 42 U.S.C. § 652(g). It is clear, then, that even when a State is in "substantial compliance" with Title IV-D, any individual plaintiff might still be among the 10 or 25 percent of persons whose needs ultimately go unmet. Moreover, even upon a finding of substantial noncompliance, the Secretary can merely reduce the State's AFDC grant by up to five percent; she cannot, by force of her own authority, command the State to take any particular action or to provide any services to certain individuals. In short, the substantial compliance standard is designed simply to trigger penalty provisions that increase the frequency of audits and reduce the State's AFDC grant by a maximum of five percent. As such, it does not give rise to individual rights.

*Blessing*, 520 U.S. at 343-44.

In addition to holding that Title IV-D's substantial compliance provisions did not give rise to individually enforceable rights, the Supreme Court observed that "many other provisions" of Title IV-D did not fit the "traditional three criteria for identifying statutory rights." *Blessing*, 520 U.S. at 344. For example, the Court concluded that Title IV-D's "detailed requirements for the State's data processing system" did not "give rise to individualized rights to computer services" because "these complex standards" were "simply intended to improve the overall efficiency of the States' child support enforcement scheme." *Id*. at 344-45 (citing 42 U.S.C.A. § 654a (Nov. 1996 Supp.); 45 CFR § 307.10 (1995)). Similarly, the Court concluded that Title IV-D did not give rise to individually enforceable rights to adequate staffing levels, despite the fact that Title IV-D required "each participating State to establish a separate child support enforcement unit 'which meets such staffing and organizational requirements as the Secretary may by regulation prescribe.'" *Blessing*, 520 U.S. at 345 (quoting 42 U.S.C. § 654(3)).

Despite its holding, the Supreme Court specifically indicated that it was not

foreclosing "the possibility that some provisions of Title IV-D [gave] rise to individual rights." ***Blessing***, 520 U.S. at 345. For example, the Court suggested that the $50 pass-through provision that existed in the pre-1996 version of Title IV-D might give one of the claimants a "federal right to receive a specified portion of the money collected on her behalf by Arizona." ***Id.*** at 345-46 (citing 42 U.S.C. § 657(b)(1)). Inasmuch as the claimant did not explicitly request such relief in the complaint, however, the Court did not address this issue further. ***See Blessing***, 520 U.S. at 346.

Based on the foregoing analysis, the Supreme Court remanded the case for the trial court "to construe the complaint in the first instance, in order to determine exactly what rights, considered in their most concrete, specific form, [the claimants] are asserting." ***Blessing***, 520 U.S. at 346. The Court explained that "[o]nly by manageably breaking down the complaint into specific allegations can the [trial court] proceed to determine whether any specific claim asserts an individual federal right." ***Id.***

### III. Analysis of Plaintiffs' 1983 Claims

Although ***Blessing*** does not indicate what other enforceable rights might exist under Title IV-D, the opinion does make clear that a court can make this determination only by separately analyzing each asserted claim and the specific statutory provisions that allegedly give rise to such a claim. ***See Blessing***, 520 U.S. at 342. Accordingly, the present appeal requires this court to analyze each of the Plaintiffs' asserted claims and the specific statutory provisions upon which they relied to assert such claims.

In their amended complaint, the Plaintiffs asserted that the Director of Child Support Services had violated their rights to receive certain child support services that were mandated by Title IV-D, including services involving the location of noncustodial parents, the establishment of child support obligations, and the enforcement of child support orders. At trial and on appeal, the Plaintiffs relied upon the following statutory provisions to support their contention that Title IV-D gave them individually enforceable rights to receive these child support services.

Section 653 of the Child Support Enforcement Act requires the Secretary of the

Department of Health and Human Services to "establish and conduct a Federal Parent Locator Service." 42 U.S.C.A. § 653(a)(1) (West 1991 & Supp. 1999). The Federal Parent Locator Service, in turn, is required to "obtain and transmit" the following information to any "authorized person" who submits a request for such information in the manner and form prescribed by the Secretary:

> (A)    information on, or facilitating the discovery of, the location of any individual –
>
>> (i)    who is under an obligation to pay child support;
>>
>> (ii)    against whom such an obligation is sought;
>>
>> (iii)    to whom such an obligation is owed; or
>>
>> (iv)    who has or may have parental rights with respect to a child,
>
> including the individual's social security number . . . , most recent address, and the name, address, and employer identification number of the individual's employer;
>
> (B)    information on the individual's wages (or other income) from, and benefits of, employment . . . ; and
>
> (C)    information on the type, status, location, and amount of any assets of, or debts owed by or to, any such individual.

42 U.S.C.A. § 653(a)(2) (West 1991 & Supp. 1999). Upon the request of any authorized person, the Secretary of Health and Human Services must provide the foregoing information through the Federal Parent Locator Service if the information is contained in the Secretary's or the Department's files or if the information can be obtained by the Secretary from any federal or state department or agency. *See* 42 U.S.C.A. § 653(b)(1) (West 1991 & Supp. 1999). The Act requires the Secretary to "promptly undertake to provide the information" upon receipt of a properly submitted request. 42 U.S.C.A. § 653(e)(1) (West 1991 & Supp. 1999). Section 653 defines "authorized person" to include a state agency that is administering that state's Title IV-D program, a state agent or attorney who has the authority to seek to recover child support under the state's Title IV-D plan, the court which has the authority to issue a child support order against the noncustodial parent, and "the resident parent, legal guardian, attorney, or agent of a child (other than a child receiving assistance

under a State program funded under part A of this subchapter)."[6]  42 U.S.C.A. § 653(c) (West

1991 & Supp. 1999).


Regarding the state's responsibilities to provide location services, section 654(8) of

the Act provides that


[a] State plan for child and spousal support must –

(8)    provide that, . . . the agency administering the plan will establish a service to locate parents utilizing –

(A)    all sources of information and available records; and

(B)    the Federal Parent Locator Service established under section 653 of this title, . . . .


42 U.S.C.A. § 654(8) (West 1991 & Supp. 1999).


The provisions of Title IV-D also require the Secretary of Health and Human Services

to establish


within the Department of Health and Human Services a separate organizational unit, under the direction of a designee of the Secretary, who shall report directly to the Secretary and who shall –

(1)    establish such standards for State programs for locating noncustodial parents, establishing paternity, and obtaining child support and support for the spouse (or former spouse) with whom the noncustodial parent's child is living as he determines to be necessary to assure that such programs will be effective;

(2)    establish minimum organizational and staffing

---

[6]Part A of subchapter IV governs AFDC grants. *See* 42 U.S.C.A. §§ 601–619 (West 1991 & Supp. 1999).

requirements for State units engaged in carrying out such programs under plans approved under this part.

42 U.S.C.A. § 652(a) (West 1991 & Supp. 1999). Title IV-D further provides that the standards required by section 652(a), as set forth above,

shall include standards establishing time limits governing the period or periods within which a State must accept and respond to requests (from States, jurisdictions thereof, or individuals who apply for services furnished by the State agency under this part or with respect to whom an assignment pursuant to section 608(a)(3)[7] of this title is in effect) for assistance in establishing and enforcing support orders, including requests to locate noncustodial parents, establish paternity, and initiate proceedings to establish and collect child support awards.

42 U.S.C.A. § 652(h) (West 1991 & Supp. 1999) (footnote added).

In order to be eligible for Title IV-D funding, a state, through its chief executive officer, must certify that the state will operate a child support enforcement program under an approved plan. *See* 42 U.S.C.A. § 602(a)(2) (West 1991 & Supp. 1999). The state's plan for child support enforcement must

(4)     provide that the State will –

(A)     provide services relating to the establishment of paternity or the establishment, modification, or enforcement of child support obligations, as appropriate, under the plan with respect to –

(i)     each child for whom [assistance, benefits or services are provided under specified federal programs, including AFDC], unless, . . . good cause or other exceptions exist;

(ii)     any other child, if an individual applies for such services with respect to the child; and

(B)     enforce any support obligation established with respect to –

(i)     a child with respect to whom the State provides services under the plan; or

---

[7]Section 608(a)(3) requires AFDC recipients to assign their rights to support to the state. *See* 42 U.S.C.A. § 608(a)(3)(A) (West 1991 & Supp. 1999).

> (ii)     the custodial parent of such a child.
>
> . . . .
>
> (13)    provide that the State will comply with such other requirements and standards as the Secretary determines to be necessary to the establishment of an effective program for locating noncustodial parents, establishing paternity, obtaining support orders, and collecting support payments . . . .
>
> . . . .
>
> (20)    provide, . . . that the State (A) shall have in effect all of the laws to improve child support enforcement effectiveness which are referred to in [section 666], and (B) shall implement the procedures which are prescribed in or pursuant to such laws.

42 U.S.C.A. §§ 654(4), 654(13), 654(20) (West 1991 & Supp. 1999). Section 666, referred to above, requires the state to have in effect laws requiring the use of certain procedures for withholding child support payment amounts from a noncustodial parent's income. *See* 42 U.S.C.A. §§ 666(a)(1)(A), 666(b) (West 1991 & Supp. 1999).

After carefully reviewing the foregoing statutory provisions, as well as the allegations of the Plaintiffs' amended complaint, we agree with the trial court's ruling that the complaint fails to assert the violation of any individually enforceable rights under Title IV-D. As an initial matter, we observe that some of the cited statutory provisions do not directly impose obligations upon the state of Tennessee. Rather, these provisions set forth the responsibilities of the Secretary of Health and Human Services. Section 653 of the Act, for example, sets forth the Secretary's responsibilities for establishing and conducting the Federal Parent Locator Service. *See* 42 U.S.C.A. § 653(a)(1) (West 1991 & Supp. 1999). Section 653 requires the Secretary to establish such a service and to promptly undertake to provide information requested by authorized persons. *See* 42 U.S.C.A. §§ 653(b)(1), 653(e)(1) (West 1991 & Supp. 1999). Moreover, even if these provisions could be construed as imposing direct obligations upon the state, we note that the Plaintiffs' complaint fails to allege that they fell within section 653's definition of authorized person or that they submitted a request for information under section 653.[8]

---

[8]In the amended complaint, Plaintiff Jennifer Aric alleged that state agents refused to tell her if any location information had been received. As noted above, however, Aric failed to allege that she was an authorized person within the meaning of section 653 or that she submitted a request for information under that section.

The remaining statutory provisions cited by the Plaintiffs present a closer question as to whether these provisions confer individually enforceable rights upon the Plaintiffs. Section 652(a) of the Act requires the Secretary of Health and Human Services, through her designee, the Office of Child Support Enforcement (OCSE), to establish standards for state programs for locating noncustodial parents, establishing paternity, and obtaining child support. *See* 42 U.S.C.A. § 652(a)(1) (West 1991 & Supp. 1999).[9] Under this section, the OCSE must create "standards establishing time limits governing the period or periods within which a State must accept and respond to requests . . . for assistance in establishing and enforcing support orders, including requests to locate noncustodial parents, establish paternity, and initiate proceedings to establish and collect child support awards." 42 U.S.C.A. § 652(h) (West 1991 & Supp. 1999). Thus, section 652(h) appears to require the state to accept and respond to requests for child support services within time limits established by the OCSE.[10]

Moreover, section 654 requires the state to include specified provisions within its plan for child support enforcement. Specifically, section 654 requires the state to include provisions indicating that the state will provide the following services: locating noncustodial parents; establishing paternity; and establishing, modifying, and enforcing child support obligations. *See* 42 U.S.C.A. §§ 654(4), 654(8) (West 1991 & Supp. 1999). In addition to indicating that the state will provide the foregoing services, the state's plan must indicate that the state will comply with the Secretary's requirements and standards for providing these services. *See* 42 U.S.C.A. § 654(13) (West 1991 & Supp. 1999). Finally, as required by the remaining statutory provisions cited by the

---

Plaintiff Patricia Davis alleged that state agents refused to allow her former counsel to review her child support file and, further, that they refused to provide information as to the status of her case or any actions taken to obtain child support for her children; however, Davis did not cite any provision of Title IV-D that would entitle her to this information.

[9]Section 652(a) additionally requires the OCSE to establish minimum organizational and staffing requirements for states administering Title IV-D programs. *See* 42 U.S.C.A. § 652(a)(2) (West 1991 & Supp. 1999). The organizational and staffing requirements referred to in section 652(a) appear to be the same requirements that are referred to in section 654(3) of the Act. *See* 42 U.S.C.A. § 654(3) (West 1991 & Supp. 1999). As we previously observed, the Supreme Court in *Blessing* held that section 654(3) did not give rise to individually enforceable rights to adequate staffing levels. *See Blessing*, 520 U.S. at 345.

[10]We note, however, that section 652(h) merely requires the state to "accept and respond to" such requests; it does not require the state to succeed in its efforts to locate noncustodial parents, establish paternity, establish child support obligations, or enforce child support orders. *See* 42 U.S.C.A. § 652(h) (West 1991 & Supp. 1999).

Plaintiffs, the state's plan must provide that the state will enact laws requiring the use of specified procedures for withholding child support payment amounts from a noncustodial parent's income. *See* 42 U.S.C.A. §§ 654(20), 666 (West 1991 & Supp. 1999). Although these statutory provisions merely require the state to include certain provisions in its plan for child support enforcement, the argument could be made that the provisions go one step further by requiring the state to actually provide these services when the state implements its plan and to provide such services in accordance with the standards established by the Secretary. *See, e.g.*, *Wilder v. Virginia Hosp. Ass'n*, 496 U.S. 498, 512 (1990) (concluding that Boren Amendment, which required state plan for medical assistance to provide for payment of hospitals according to rates found by state to be reasonable and adequate, was "cast in mandatory rather than precatory terms"). This argument is supported by the related regulations promulgated by the Secretary, many of which specify what actions a state's IV-D agency "must" take when it provides these services under the state's plan for child support enforcement. *See, e.g.*, 45 C.F.R. §§ 303.3 (Location of noncustodial parents); 303.4 (Establishment of support obligations); 303.5 (Establishment of paternity); 303.6 (Enforcement of support obligations); 303.7 (Provision of services in interstate IV-D cases); 303.100 (Procedures for income withholding) (1999).

Despite the arguably mandatory language found in section 654 and its related regulations, we conclude that, contrary to the Plaintiffs' contention, section 654 does not confer upon them individually enforceable rights to location, establishment, and enforcement services. We reach this conclusion because, by its own terms, Title IV-D requires only "substantial compliance" with most of its provisions. 42 U.S.C.A. § 609(a)(8) (West 1991 & Supp. 1999). For example, a state's program is in substantial compliance with Title IV-D's provisions requiring it to provide services to establish paternity if the state's paternity establishment percentage equals or exceeds ninety percent (90%). *See* 42 U.S.C.A. § 652(g) (West 1991 & Supp. 1999). With regard to most remaining services, the Secretary historically has defined substantial compliance as seventy-five percent (75%) compliance. *See* 45 C.F.R. § 305.20 (1998). Similarly, new regulations recently proposed by the Secretary require only 75% compliance for most remaining services, including, as pertinent to this appeal, locating noncustodial parents, obtaining support orders, and enforcing support obligations. *See* Child Support Enforcement Program, 64 Fed. Reg. 55,074, 55,101 (1999) (to be codified at 45 C.F.R. § 305.63(c)) (proposed Oct. 8, 1999).

In our view, the Plaintiffs' claim that Title IV-D confers upon them individually enforceable rights is simply at odds with Title IV-D's substantial compliance provisions. As observed by the Supreme Court in **Blessing**, even when the state is meeting its obligations under Title IV-D, "any individual plaintiff might still be among the 10 or 25 percent of persons whose needs ultimately go unmet." **Blessing v. Freestone**, 520 U.S. 329, 344 (1997). Although the Plaintiffs are not seeking to enforce Title IV-D's substantial compliance provisions, as were the claimants in **Blessing**, we believe that the result is the same. In the present case, the Plaintiffs claim that Title IV-D grants them individually enforceable rights to receive services for locating noncustodial parents, establishing paternity, obtaining child support orders, and enforcing child support obligations. These are the precise services for which Title IV-D requires only the state's "substantial compliance." Inasmuch as Congress obviously envisioned that states would achieve less than one hundred percent (100%) compliance with many of Title IV-D's provisions,[11] such as the provisions at issue here, we conclude that, as a general rule, Congress did not intend to confer upon individual recipients of Title IV-D services an enforceable right to receive those services.

At least one federal appellate court has reached the same conclusion based upon its interpretation of **Blessing**. In an unpublished decision, **Barnes v. Anderson**, No. 95-15969, 1997 WL 583325 (9th Cir. Sept. 19, 1997),[12] the United States Court of Appeals for the Ninth Circuit held that **Blessing** barred the plaintiffs' claims that they were entitled to receive child support enforcement services under Title IV-D. The court first cited **Blessing**'s holding that "Title IV-D does not give individuals a federal right to force a state agency to substantially comply with Title IV-D" because "the requirement that a State operate its child support program in 'substantial compliance' with Title IV-D was not intended to benefit individual children and custodial parents, and therefore it does not constitute a federal right." **Barnes**, 1997 WL 583325, at *1 (quoting

_____

[11]The proposed regulations apparently require 100% compliance in only the following areas: statewide operations (45 C.F.R. § 302.10); reports and maintenance of records (45 C.F.R. § 302.15(a)); separation of cash handling and accounting functions (45 C.F.R. § 302.20); and notice of collection of assigned support (45 C.F.R. § 302.54). *See* Child Support Enforcement Program, 64 Fed. Reg. 55,074, 55,101 (1999) (to be codified at 45 C.F.R. § 305.63(a)) (proposed Oct. 8, 1999).

[12]We recognize that the Court of Appeals designated its decision as "not appropriate for publication" and that, pursuant to Ninth Circuit Rule 36-3, the decision's precedential value is limited. Nevertheless, we agree with the court's analysis of this issue, and we adopt it as our own.

*Blessing*, 520 U.S. at 333, 343). The court then interpreted *Blessing* "as further holding that Title IV-D does not 'unambiguously impose a binding obligation on the States.'" *Barnes*, 1997 WL 583325, at *1 (quoting *Blessing*, 520 U.S. at 341). In concluding that *Blessing* barred the plaintiffs' claims, the court explained:

> Absent the imposition of . . . a binding obligation, Title IV-D does not affect a liberty or property interest protected by the Due Process Clause. *See Board of Regents v. Roth*, 408 U.S. 564, 569 (1972). As the Supreme Court pointed out in [*Blessing*], the [plaintiffs] can have no "legitimate claim of entitlement" to enforcement services, *Roth*, 408 U.S. at 569, because "even when a State is in 'substantial compliance' with Title IV-D, any individual plaintiff might still be among the 10 or 25 percent of persons whose needs ultimately go unmet."

*Barnes*, 1997 WL 583325, at *1 (quoting *Blessing*, 520 U.S. at 344).

A federal district court also has interpreted *Blessing* to hold "that Title IV-D does not generally give rise to any individually enforceable rights." *Brinkley v. Hill*, 981 F. Supp. 423, 427 (S.D. W. Va. 1997). Citing various statutory and regulatory provisions, the plaintiffs in that case claimed that state officials had violated their rights to receive certain Title IV-D services by, *inter alia*, failing to pursue mandatory collection procedures, failing to establish paternity by acknowledgment, failing to pursue enforcement of child support orders, failing to employ all available legal remedies for collecting past due child support, failing or refusing to take action against employers who did not enforce wage withholding, and failing or refusing to use proper locator and search methods. *See Brinkley*, 981 F. Supp. at 438-41. After examining the statutory and regulatory provisions cited by the plaintiffs, the court concluded that none of them created individually enforceable rights to receive the requested services. *See id*. In reaching this conclusion, the court observed that the plaintiffs' "exhaustive requests for relief . . . are in fact nothing more than an elaborate request for substantial compliance." *Brinkley*, 981 F. Supp. at 438.[13]

---

[13]The Plaintiffs have provided this court with copies of two unreported decisions of federal district courts which, they contend, support the claims asserted in their amended complaint. We conclude that the first decision, *Emmons v. Murray*, No. 91-CV-40411-FL, slip op. at 5-8 (E.D. Mich. Aug. 26, 1997), is distinguishable from the present case because that decision dealt with section 657 of the Act, governing the state's distribution of collected support.

In *Young v. Anderson*, No. S-95-942, slip op. at 10-16 (E.D. Cal. Jan. 7, 2000), the court ruled that sections 652(h) and 654(4) of the Act created individually enforceable rights to receive

The result we reach today also is consistent with the result reached by the Supreme Court in a case decided prior to *Blessing.* In *Suter v. Artist M.*, 503 U.S. 347, 352 (1992), the claimants brought a 1983 action against officials of the Illinois Department of Children and Family Services based upon a provision of the Adoption Assistance and Child Welfare Act.[14] That provision, section 671(a)(15), required "that to obtain federal reimbursement, a State have a plan which 'provides that, in each case, reasonable efforts will be made . . . to prevent or eliminate the need for removal of the child from his home, and . . . to make it possible for the child to return to his home.'" *Suter*, 503 U.S. at 358 (quoting 42 U.S.C. § 671(a)(15) (1988 & Supp. I 1989)). The Supreme Court framed the dispositive issue before it as whether Congress, "in enacting the Adoption Act, unambiguously confer[red] upon the child beneficiaries of the Act a right to enforce the requirement that the State make 'reasonable efforts' to prevent a child from being removed from his home, and once removed to reunify the child with his family." *Suter*, 503 U.S. at 357. Despite Congress's use of mandatory terms in section 671(a)(15), the Court concluded that this section did "not create a federally enforceable right to 'reasonable efforts' under § 1983." *Id*. at 363. The Court reasoned that

> [c]areful examination of the language relied upon by [the claimants], in the context of the entire Act, leads us to conclude that the "reasonable efforts" language does not unambiguously confer an enforceable right upon the Act's beneficiaries. The term "reasonable efforts" in this context is at least as plausibly read to impose only a rather generalized duty on the State, to be enforced not by private individuals, but by the Secretary [of Health and Human Services].

*Id*.[15]

As we previously indicated, in *Blessing* the Supreme Court specifically left open the

location and enforcement services. We acknowledge that the court's decision in *Young* is inconsistent with the result we reach today, but we decline to follow *Young*.

[14]The provisions of the Adoption Assistance and Child Welfare Act appear in Titles IV-B and IV-E of the Social Security Act. *See Suter*, 503 U.S. at 350 (citing U.S.C. §§ 620–628, 670–679a (1988 & Supp. I 1989)).

[15]Congress subsequently enacted a statute overturning *Suter* to the extent that its holding relied upon the rationale that the provision was included "in a section of [the Social Security Act] requiring a State plan or specifying the required contents of a State plan." 42 U.S.C.A. § 1320a-2 (West Supp. 1999). Significantly, however, Congress left intact *Suter*'s holding "that section 671(a)(15) . . . is not enforceable in a private right of action." *Id*.

possibility that Title IV-D might give rise to some individually enforceable rights. *See Blessing*, 520 U.S. at 346. The only right arguably recognized by the Court, however, was one arising under section 657 of the Act, which governs the state's distribution of collected support. *See id*. at 345-46. Prior to 1996, section 657(b)(1) provided that the first $50 of each monthly support payment would be paid to the family receiving AFDC. *See* U.S.C.A. § 657(b)(1) (West 1991). In *Blessing*, one of the claimants alleged that the state had collected some support payments from the noncustodial parent but had failed to pass through the first $50 of each payment. *See Blessing*, 520 U.S. at 345-46. Referring to the $50 pass-through provision contained in the pre-1996 version of the statute, the Court suggested that section 657 might give an AFDC recipient a federal right to receive a specified portion of the money collected on her behalf by the state. *See id*. The Court did not decide this issue, however, because the claimant did not explicitly request this relief in the complaint. *See id*. at 346.

In the present case, Plaintiff Jennifer Aric alleged that the Director of Child Support Services had collected some child support by wage assignment forwarded by Kevin Jennings' employer but that the Director had "not sent the full amount collected as child support to Ms. Aric as required by federal law." Significantly, however, the amended complaint did not cite any provision of Title IV-D that would entitle Aric to receive "the full amount collected as child support," nor did the complaint explicitly request such relief. Accordingly, we need not decide whether Title IV-D might give rise to such an individually enforceable right. *See Blessing*, 520 U.S. at 345-46.[16]

---

[16]As noted by the Supreme Court in *Blessing*, Congress replaced section 657's "$50 pass-through with more generous distributions to families once they leave welfare." *Blessing*, 520 U.S. at 334 (citing 42 U.S.C.A. § 657(a)(2) (Nov. 1996 Supp.)). The current version of section 657 specifies how the state shall distribute amounts collected on behalf of a family as support. *See* 42 U.S.C.A. § 657(a) (West 1991 & Supp. 1991). The method of distribution differs depending upon whether the family (1) currently receives AFDC, (2) formerly received AFDC, or (3) never received AFDC. *See* 42 U.S.C.A. §§ 657(a)(1)–(a)(3) (West 1991 & Supp. 1999). Under section 657(a), only families who never received AFDC are entitled to the full amount collected. *See* 42 U.S.C.A. § 657(a)(3) (West 1991 & Supp. 1999).

According to the amended complaint, Plaintiff Jennifer Aric was receiving "welfare aid" when her second child was born in July 1993. The complaint does not make clear whether Aric was receiving AFDC payments in February 1992, when her first child was born, or in July 1997, when the noncustodial parent of her first child was ordered to pay child support, but the complaint's allegations suggest that Aric has received AFDC in the past. Thus, even if Aric had explicitly sought relief under section 657(a)(3), the allegations of the complaint indicate that she was not entitled to such relief.

In conclusion, we hold that the Plaintiffs' amended complaint fails to state a claim for relief against the Director of Child Support Services under 1983 because the complaint fails to successfully allege the violation of an individually enforceable right under Title IV-D of the Social Security Act, also known as the Child Support Enforcement Act. Contrary to the Plaintiffs' contentions, the cited statutory and regulatory provisions[17] do not unambiguously confer upon them enforceable rights to receive Title IV-D services. Instead, Title IV-D requires only "substantial compliance" with its provisions, and relative to the provision of most Title IV-D services, the Secretary has defined "substantial compliance" as 75% compliance. Inasmuch as the Plaintiffs have failed to demonstrate an entitlement to specific Title IV-D services, we conclude that the trial court did not err in dismissing their amended complaint. In light of our holding, we need not address the remaining issues raised by the parties on appeal.

The trial court's judgment is affirmed, and this cause is remanded for further proceedings consistent with this opinion. Costs of this appeal are taxed to Plaintiffs/Appellants Patricia Davis and Jennifer Aric, for which execution may issue if necessary.

---

[17]We also reject any suggestion that the regulations promulgated by the Secretary, by themselves, may confer individually enforceable rights upon the Plaintiffs. *See Harris v. James*, 127 F.3d 993, 1009 (11th Cir. 1997) (reasoning that "[t]o hold otherwise would be inconsistent with the driving force of the Supreme Court precedent requiring a Congressional intent to create federal rights and with the Supreme Court's directive that courts must find that Congress has unambiguously conferred federal rights on the plaintiff"); *Brinkley v. Hill*, 981 F. Supp. 423, 439 (S.D. W. Va. 1997) (holding that, in order to maintain 1983 action, claimants must allege violation of federal statutory law and not merely violation of federal regulation); *see also* Todd E. Pettys, *The Intended Relationship Between Administrative Regulations and Section 1983's "Laws"*, 67 Geo. Wash. L. Rev. 51, 53 (1998) (contending that "Congress almost certainly would not have used the word 'laws' in section 1983 if it intended to provide a remedy for violations of regulatory rights"); *but see Boatman v. Hammons*, 164 F.3d 286, 289 (6th Cir. 1998) (indicating that Sixth Circuit "has held to the contrary that because federal regulations have the force of law, they must be characterized as 'law' under § 1983"). Compare *Smith v. Dearborn Financial Services, Inc.*, 982 F.2d 976 (6th Cir. 1993), dealing with the related issue of whether a federal statute creates an implied private right of action, wherein the court explained that

> federal regulations cannot themselves create a cause of action; that is a function of the legislature. . . . A grant of federal rulemaking power is not authority to create federal jurisdiction. That authority lies solely with Congress. . . . Therefore, no implied private right of action can be found from the regulations standing alone. Rather, the statute must be examined to determine if an implied private right of action can be found from the statute.

*Smith*, 982 F.2d at 979 (citations omitted).

_____
FARMER, J.


_____
CRAWFORD, P.J., W.S.


_____
HIGHERS, J.